UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

County 20 Storage & Transfer, Inc.,        )
and Robert L. Nelson, as successor in      )        Civil No. 3:09-CV-104
interest to Precision Equipment            )
Manufacturing of North America, Inc.,      )
                                           )
                  Plaintiffs,              )        **PLAINTIFFS' BRIEF IN SUPPORT OF**
                                           )        **MOTION FOR SUMMARY JUDGMENT**
                                           )
        vs.                                )
                                           )
Wells Fargo Bank, N.A.,                    )
                                           )
                  Defendant.               )
---------------------------------------------------------

## I.    INTRODUCTION

Plaintiffs, County 20 Storage & Transfer, Inc., and Robert L. Nelson, as successor in interest to Precision Equipment Manufacturing of North America, Inc., hereinafter jointly and severally referred to as "Nelson", hereby submits this brief in support of Nelson's Motion for Summary Judgment on his Complaint.

## II.    FACTS

In the summer of 2007, Nelson commenced construction of a warehouse in Fargo, North Dakota.  Nelson determined to use his cash reserves to fund the construction of the warehouse.  (Robert L. Nelson Depo., p. 82, 8/26/10), attached hereto as Exhibit A.  After the warehouse was constructed, Nelson sought permanent financing for the warehouse project.  (Nelson Depo., p. 83).

Nelson, having a banking relationship with Wells Fargo in excess of 20 years, approached his personal banker, Dan Staller regarding obtaining permanent financing for the construction of the commercial warehouse.  (Nelson Depo., pp. 61, 116).  Dan Staller had been Nelson's personal banker prior to 2003 and Nelson worked exclusively

with Staller regarding his commercial banking. (Nelson Depo., p. 116). Nelson and Staller socialized. Nelson was invited to Wells Fargo box seats for sporting events and concerts. (Nelson Depo., p. 117). Nelson also took Staller on fishing trips to Alaska. (Nelson Depo., p. 117). Nelson defines his relationship with Staller as a relationship in which he trusts his bankers are looking out for Nelson's best interests. (Nelson Depo., p. 91).

Nelson approached Dan Staller in 2007 seeking a five (5) year promissory note with a fixed rate of interest to finance his construction of a new building. Staller informed Nelson that Wells Fargo could offer him two financial products to meet his needs. The first product was a typical/conventional promissory note secured by mortgage against the warehouse. (Nelson Depo., p. 92). The promissory note would bear interest at 6.4%. (Nelson Depo., p. 92). The second product presented to Nelson was a swap agreement with a fixed rate of interest of 6.1%. (Nelson Depo., pp. 92-94). For Nelson to obtain the interest rate of 6.1%, Staller informed Nelson that he would have to enter into an International Swap Dealer Agreement. Id. Exhibit G.

The swap works this way:

1.  Nelson agrees to pay Wells Fargo Moorhead, Minnesota, branch bank $2,450,000.00 at a variable rate of interest, LIBOR plus 1.4%. The interest rate would be adjusted monthly. LIBOR is the London Interbank Offered Rate. LIBOR rates are published in newspapers. Wells Fargo Moorhead, Minnesota, would receive this interest payment monthly by electronic fund transfers from Nelson's account at Wells Fargo.

2.    The monthly derivative payment (swap) is the difference between the 6.1% fixed rate less the variable rate of interest paid to the Moorhead Wells Fargo office monthly, LIBOR plus 1.4%.   The derivative payment was tendered to Wells Fargo corporate monthly from Bob Nelson's account at Wells Fargo through ACH transactions.   The Wells Fargo office in San Francisco would receive the difference between 6.1% fixed rate of interest less the interest payments tendered to Wells Fargo Moorhead, the LIBOR plus 1.4%.

3.    In a rare instance, should interest rates exceed 6.1% because the LIBOR rate increased substantially, Wells Fargo San Francisco, pursuant to the derivative/swap agreement, would have to pay Bob Nelson interest monthly.   During Nelson's loan with Wells Fargo, LIBOR plus 1.4% never exceeded the fixed rate of 6.1%.

4.    Monthly, Nelson was tendering interest to Wells Fargo Moorhead office and Wells Fargo San Francisco pursuant to two (2) ACH monthly payments.

(Brian D. Knapp Depo., pp. 112-120, 9/15/10), attached hereto as Exhibit B.

A swap is a separate contract from the loan.   (Scott N. Berg Depo., 8/23/10, (Berg Depo.) p. 17, attached hereto as Exhibit C).

Staller, despite having 15 years of experience in banking, testified that he is "challenged at best" to understand how a swap agreement works.   (Daniel D. Staller Depo., p. 139, 8/25/10, attached hereto as Exhibit D).   Staller sold six (6) swaps to

clients having only limited knowledge regarding how the swaps worked.  (Staller Depo., p. 39).

As a standard procedure, Brian Knapp from Wells Fargo Minneapolis provides additional insight as to International Swap Dealer Agreements.  Nelson had a 10 minute telephone conference with Knapp regarding swap agreements.  (Knapp Depo, p. 101, 9/15/10).  The presentation presented to Nelson included an "interest rate presentation" which briefly explains how swaps work, a copy attached hereto as Exhibit H.  The interest rate presentation emphasized "portability."  Id.  The presentation stated that a swap was portable in that "[i]f the loan was prepaid, the swap can be used to fix the rate on other floating rate obligations you may have."

Nelson entered into the swap agreement because of the difference in the interest rates, swap at 6.1% fixed or a typical loan at 6.4% fixed (Nelson Depo., pp. 92-93), and, pursuant to the representations and warranties made to Nelson regarding the benefits of swap agreements.  (Nelson Depo., p. 107).  Nelson's concern regarding the swap agreement was if he changed borrowers or changed collateral, would such harm Nelson resulting in a penalty.  (Nelson Depo., p. 93).  Nelson was reassured that as long as he had debt with Wells Fargo with appropriate collateral, the loan would continue to fruition.  (Nelson Depo., p. 93).  Nelson testified that Staller informed him that as long as he had debt he could achieve this fixed rate through the swap agreement.  (Nelson Depo., p. 94).  Nelson was also informed that as long as he had debt, whether existing, present or future, and Nelson was able to secure loans with collateral, the interest rate would not change and it would continue for 5 years.  (Nelson Depo., pp. 94-95).  Nelson was informed that if he sold the collateral securing the loan,

as long as he had sufficient collateral, the parties would substitute collateral and/or parties and the swap would continue.  (Nelson Depo., pp. 94-96).  Nelson further understood the portability of a swap agreement was like a name change.  (Nelson Depo., p. 96).  Parties obligated to Wells Fargo could be substituted.

Nelson understood that if he paid off a promissory note that was paired with the swap agreement and did not replace the note with other indebtedness, there would be some sort of a penalty.  (Nelson Depo., p. 97).  Nelson understood that as long as he had collateral of equal or better value than the collateral sold, Wells Fargo would replace the collateral and the promissory note and swap agreement would continue to fruition.  (Nelson Depo., p. 97).  Nelson understood that there was no requirement that a new promissory note would have to be entered between the parties.  Id.  In 2008 pursuant to the swap agreement, Wells Fargo allowed the original indebtedness from County 20 to be transferred to Precision Equipment and the transfer went seamless with no problems.  (Nelson Depo., p. 98).  Nelson testified he never believed any issues would occur if he needed to transfer the Precision Equipment note/indebtedness back to County 20 and provide Wells Fargo with another building of greater or equal value than the note.  (Nelson Depo., p. 98).  Nelson understood he had to carry debt for five (5) years in connection with the swap agreement in order to have the swap agreement make economic sense.  (Nelson Depo., p. 66).  Nelson entered into the swap agreement in November 2007 requiring an interest payment to commence January 2008.  Nelson did not formally receive the loan proceeds until April 2008.  (Nelson Depo., p. 107).  The delay was caused by erroneous governmental flood maps indicating that the warehouse that County 20 was granting Wells Fargo a lien upon to

secure repayment under the promissory note and swap agreement was built in a flood zone and needed flood insurance.  (Nelson Depo., p. 108).  The warehouse was not built in a flood zone and did not need flood insurance.  (Nelson Depo., p. 109).  However, Nelson had to pay interest payments on the swap despite no funds were advanced for the months of February, March, April and May, 2009.  (Nelson Depo., p. 109).  Nelson paid approximately $30,000.00 monthly interest payments under the swap agreement to Wells Fargo despite no principal advance during this period of time.  (Staller Depo., p. 79, 84).

The original swap loan was placed in the name of County 20 Storage & Transfer, Inc.  (Staller Ex. 21, Promissory Note attached hereto as Exhibit I).  The building was owned by County 20 Storage & Transfer, Inc.  Id.  After the loan proceeds were advanced and due to the portability of the swap agreement, Nelson approached Wells Fargo to request that Wells Fargo substitute the borrower from County 20 Storage & Transfer to another corporate entity owned by Bob Nelson, Precision Equipment Manufacturing of North America, Inc.  (Berg Depo., 8/23/10, p. 36).  Nelson requested the substitution of borrower and collateral so Nelson could sell the collateral, the building at a profit.  Nelson suggested the loan be secured by Precision Equipment's assets.  A new promissory note was executed in May 13, 2008 accordingly where the debt was transferred from County 20 to Precision Equipment. (Exhibit J).  Nelson also agreed to be a co-borrower along with Precision Equipment Manufacturing.  Id.

Nelson's sale of the County 20 warehouse resulted in a large tax gain for Nelson.  (Nelson Depo., pp. 138, 139).  Precision Equipment Manufacturing was a company that had suffered losses over the last few years.  Id.  Nelson decided to shut down Precision

6

Equipment to take the tax losses.  (Nelson Depo., p. 139).  Nelson's tax accountant informed him that by shutting down Precision Equipment, Nelson could offset tax losses of Precision Equipment against the tax gains that Nelson was receiving from the sale of the County 20 building.  (Nelson Depo., pp. 138, 139).

In December 2008, Nelson approached his new loan officer at Wells Fargo, Scott Berg.  (Nelson Depo., p. 143).  Scott Berg replaced Dan Staller as Nelson's loan officer. (Berg Depo., 8/25/10, p. 9)  Dan Staller had left Wells Fargo in March 2008 to join Starion Bank.  (Staller Depo., p. 10).  Despite Bob Nelson's banker, Dan Staller, leaving Wells Fargo, Bob Nelson continued his relationship with Wells Fargo.  (Nelson Depo., pp. 116, 147).  Nelson informed his loan officer, Scott Berg, in December 2008, that Nelson desired to retransfer the note from Precision Equipment back to County 20 and provide Wells Fargo with another County 20 building as collateral.  (Nelson Depo., p. 142).  Wells Fargo had previously had the same County 20 building as collateral and a recent appraisal of the building existed.  (Nelson Depo., pp. 151, 152).

Berg responded that the transaction Nelson was contemplating was agreeable. (Berg Depo., 8/23/10, p. 44).   However, Berg informed Nelson that it would take approximately three weeks to prepare the loan documents.  (Nelson Depo., p. 162). Nelson and Berg discussed changing the names of the parties on the note and swapping collateral.  (Nelson Depo., pp. 149-152).  They further discussed that the terms and conditions on the new note would be the same as on the existing note under the swap agreement with Precision Equipment.  (Berg Depo., 8/23/10, p. 52).

Berg told Nelson that Wells Fargo could not complete the loan documents before the end of the year, December 2008.  (Berg Depo., 8/23/10, p. 30).  Nelson informed

7

Berg that he would secure financing from another lender to pay off the Precision Equipment loan. (Nelson Depo., pp. 156, 157). After January 1, 2009, Nelson would execute a replacement promissory note at Wells Fargo with County 20 Storage & Transfer being the new borrower in lieu of Precision Equipment Manufacturing. Id. Wells Fargo would also receive a mortgage in a previous building Wells Fargo had a lien upon which was recently appraised as having a value in excess of the note in question, $2,450,000.00. Id. The swap agreement would be tied to the new replacement promissory note, the January 2009, County 20 Storage & Transfer note. Id.

Nelson obtained a 90 day unsecured bridge loan from State Bank of Fargo to pay off Precision Equipment's note outstanding at Wells Fargo on December 31, 2008. Nelson paid off the Precision Equipment note premised upon Wells Fargo replacing the Precision Equipment note with a new note with County 20 Storage & Transfer as the borrower in January 2009, for the approximate amount of $2,450,000.00. (Nelson Depo., pp. 156, 157). Based upon Nelson's conversations with Wells Fargo banker, Scott Berg, the parties agreed and understood that by December 31, 2008, Nelson would pay off Precision Equipment's obligation outstanding to Wells Fargo (tied in to the swap agreement), and that by mid-January 2009, Scott Berg would prepare a replacement promissory note in which the substituted borrower would be County 20 Storage. Id. The Precision Equipment loan would be transferred to County 20 Storage in the identical amount of the Precision Equipment loan balance outstanding, the overall interest rate would remain the same, 6.1% fixed, tied to the swap agreement and that Wells Fargo would obtain a mortgage upon real estate that it previously held as

8

collateral.  (Nelson Depo., pp. 156-157).  Nelson expected the loan documents to be done in two (2) to three (3) weeks – right after the first of the year.  (Nelson Depo., p. 151).  In the second week of January 2009, Nelson contacted Berg and inquired as to the status of the loan documentation.  (Nelson Depo., p. 164).  Astoundingly, Berg informed Nelson that the economic environment had resulted in new lending requirements at Wells Fargo.  (Nelson Depo., pp. 168, 169).  Berg informed Nelson that Wells Fargo could not enter into a new note with County 20 at the same interest rate. Nelson was informed that his interest rate would increase from a fixed rate of 6.1% to between 8.7% and 9.3%.  (Nelson Depo., pp. 177, 179).  (Knapp Depo., p. 116).

Despite his dismay, Nelson agreed to pay the 8.7% – 9.3% interest and agreed to continue his relationship with Wells Fargo.  (Nelson Depo., p. 177).  Wells Fargo never prepared any substituted loan documentation.  Eventually, Nelson ceased to tender any further payments under the swap agreement and commenced the present litigation.

Nelson's swap agreement requires Nelson to pay interest to Wells Fargo regardless of whether Nelson has a principal obligation outstanding to Wells Fargo. These payments are based upon a so called "notional" principal balance of debt owed and "notional" payments reducing the principal balance.  Id.  Essentially, it involves a fictional amortization schedule, which presumes that Nelson still has debt to Wells Fargo and that Nelson is tendering an amount to reduce notional principal monthly.  Id. Under this scheme, Wells Fargo debited swap payments from Nelson's account for four (4) months in 2009, January, February, March, and April 2009.

After the commencement of this litigation, Nelson has discovered why Wells Fargo refused to consummate the parties' agreement and understanding by the second week of January of 2009. At the time of Nelson entering into the swap agreement with Wells Fargo in November 2007, LIBOR was at 4.76%. In May 2008, LIBOR was at 2.50%. In September 2008, LIBOR was at 2.92%. In December 2008, LIBOR was at 1.08%. In January 2009, LIBOR was at 0.38%. If the parties' agreement was in fact consummated in January 2009, Wells Fargo Moorhead would receive interest of only 1.78% and Wells Fargo San Francisco would receive the difference between the swap, 6.1% less 1.79% which equals 4.31%.

Brian Knapp, a derivative salesperson for Wells Fargo Bank, testified that in late December 2008 and early January 2009, Wells Fargo issued a mandate that all commercial loans with Wells Fargo had to have at least a 5% interest rate. (Knapp Depo., pp. 112, 117). With LIBOR in early January at 0.38%, the new mandate issued by Wells Fargo would require the Wells Fargo Moorhead, Minnesota, branch loan to have a fixed rate of 5%. Since the swap was at approximately 3.88%, this would result in a fixed interest rate for Bob Nelson of 8.88% to 9.3%. This is the rationale for Nelson being informed in mid-January, 2009, that his loan with Wells Fargo would now increase to 8.7% - 9.3%. (Nelson Depo., p. 177). This is the rationale for Wells Fargo breaching the parties' agreement that Nelson could substitute Precision Equipment for County 20 as the new borrower for the same amount of the indebtedness with replacement collateral under the same terms and conditions of the Precision Equipment loan, LIBOR plus 1.4%. Id. Brian Knapp testified that after Wells Fargo mandated that all commercial loans have to have a minimum of 5% interest, the sale of swaps came to a

screeching halt in business banking.  (Knapp Depo., p. 120).  Knapp testified that the sale of swap agreements did not pick up at all during the rest of the year because interest rates remained low.  Id.  Brian Knapp testified there are no exceptions to Wells Fargo's mandate that all loans have to earn at least a 5% rate of interest.  (Knapp Depo., p. 119).

Another Wells Fargo customer, Dell Arneson, suffered from the same fate.  Dell Arneson entered into a swap agreement through Dan Staller in late 2006, early 2007.  (Depo. Dell L. Arneson, 9/13/10, (Depo. Arneson) p. 17, attached hereto as Exhibit E).  Arneson utilized the portability prospects of the swap agreement to have third parties assume portions of his debt under the swap agreement.  In mid 2009, Dell Arneson also experienced Wells Fargo's decision to no longer honor portability of swap agreements.  (Arneson Depo., p. 17).  Since March 2009, Arneson has been unable to convey or assign portions of his debt to third parties despite the ability to do so previous to December 2008/January 2009.  Id.

Bob Nelson asserts that grounds exist to grant Bob Nelson summary judgment on his Complaint adjudicating Bob Nelson has no further liability to Wells Fargo pursuant to the international swap agreement due to Wells Fargo's breaches of the swap agreement portability and refusal to consummate the parties' agreement allowing Bob Nelson to substitute County 20 as the borrower of the previous Precision Equipment loan in the amount of $2,450,000.00 with the County 20 loan bearing the same terms and conditions as the Precision Equipment loan.

Berg testified that Berg and Nelson did discuss substituting Precision Equipment as the borrower to County 20, the amount of the debt to be swapped, and fixing the

11

existing swap agreement to the substituted promissory note in County 20's name. (Berg Depo., 8/23/10, pp. 43 - 44).   Berg acknowledged that the new promissory note was to run the duration of the existing swap and have the same payment terms.   Id.   In fact, Berg sent a letter to Nelson dated March 6, 2009, a copy is attached hereto as Exhibit K, ghost written by Brian Knapp, the derivative expert.   (Berg Depo., 8/25/10, pp. 70-73).   In that letter, Berg recited the following:

> On December 24, 2008, you contacted the back again and told us that Precision Equipment would not be filing bankruptcy but would instead be dissolved.   You also requested that Wells Fargo close on a new loan to County 20 Storage on or before December 31, 2008.  I explained to you at that time that a usual processing time for new loans would be three weeks and that Wells Fargo could not meet your request for a new loan secured by real estate in the last five business days of the year. There was no discussion of interest rates during this meeting. You are correct in your statement that the loan to Precision Equipment was paid off on December 31, 2008.   The swap agreement was not terminated at that time and continues to be a valid, binding obligation of the parties thereto.

Berg's letter to Nelson continued:

> On January 8, 2009, you contacted the bank and indicated that you still wanted to pursue a loan to County 20.  It was during this time, that I provided you with our general pricing guidelines on a loan.   I explained to you that based on the current economic environment, that the rates you received on the loan in 2008 were no longer available.

Staller testified that a swap was recommended to Nelson because of portability. (Staller Depo., p. 130).   Nelson understood portability to mean that the swap was similar to a line of credit.  (Nelson Depo., p. 145).   Nelson believed that if the promissory note tied to the swap was paid off, he could secure another loan to tie to the swap so long as the bank would have adequate collateral.   (Nelson Depo., p. 145).   Nelson would be provided the same rate of interest for the duration of the swap – 5 years.   Id.

For the reasons cited herewithin, this Court should grant Nelson summary judgment on his Complaint.

### III.     LAW AND ARGUMENT

### NELSON SHOULD BE GRANTED SUMMARY JUDGMENT OF HIS COMPLAINT.

### A.     Summary Judgment Standard.

Summary judgment is appropriate under N.D.R.Civ.P. 56 to promptly resolve a case on the merits, without a trial, when a party "is entitled to judgment as a matter of law, and if no dispute exists as to either the material facts or the inferences to be drawn from the undisputed facts, or if resolving disputed facts would not alter the result." Great Western Bank v. Willmar Poultry Co., 2010 ND 50, ¶ 5, 780 N.W.2d 437 (quoting Farmers Union Mut. Ins. Co. v. Associated Elec. And Gas Ins. Servs. Ltd., 2007 ND 135, ¶ 7, 737 N.W.2d 253 (quoting ACUITY v. Burd & Smith Constr., Inc., 2006 ND 187, ¶ 6, 721 N.W.2d 33)).

The movant has the burden of establishing that there are no issues of material fact and the party opposing summary judgment "will be given the benefit of all favorable inferences that can reasonably be drawn from the record." Great Western Bank, 2010 ND 50, ¶ 5, 780 N.W.2d 437 (quoting Schleuter v. Northern Plains Ins. Co., 2009 ND 171, ¶ 6, 772 N.W.2d 879).  The party opposing the motion may not simply rely upon the pleadings or unsupported, conclusory allegations, must present competent admissible evidence by affidavit or other comparable means that raises an issue of material fact, and must, if appropriate, draw the court's attention to relevant evidence in the record raising an issue of material fact.  Engel v. Montana Dakota Util., 1999 ND 111, ¶ 7, 595 N.W.2d 319 (citing Kummer v. City of Fargo, 516 N.W.2d 294, 297 (N.D.

1994)).  This requirement is not satisfied by mere speculation, conjecture, or fantasy, but requires sufficient probative evidence to allow a finding in the opposing party's favor. See Ellingson v. Knudson, 498 N.W.2d 814, 818 (N.D. 1993); Anderson v. Richardson, 145 F.Supp.2d 1131, 1136 (D.N.D. 2001).

### B.    Nelson Should be Granted Summary Judgment on his Complaint.

Nelson requests this Court to determine that Nelson has no further obligations under the International Swap Dealer Agreement due to Wells Fargo's actions.   In addition, Nelson requests this Court enter judgment in favor of Nelson and against Wells Fargo for the amount of the swap payments Wells Fargo received from Nelson in the months of February, March, April, and May, 2009, a sum in excess of $33,585.49.

Nelson asserts that due to the representations, statements and actions of Wells Fargo, Nelson paid off the Precision Equipment/Nelson obligation outstanding to Wells Fargo on or about December 31, 2008, in an amount in excess of $2,150,000.00. Nelson paid off the indebtedness premised upon Wells Fargo entering into a replacement promissory note with an identical dollar amount and interest rate but this time, the loan in the name of County 20 Storage & Transfer with the debt being secured by real estate mortgaged upon property previously mortgaged to Wells Fargo having a value in excess of the indebtedness.  (Nelson Depo., pp. 149 - 154).  The doctrine of promissory estoppel supports Nelson's claim for relief.

The doctrine of promissory estoppel requires four elements to be established: 1) A promise which the promisor should reasonable expect that caused the promisee to change his position; 2) A substantial change of the promisee's position through action, or forbearance; 3) Justifiable reliance on the promise; and 4) Injustice which can only be

avoided by enforcing a promise.   University Hotel Development, LLC v. Dusteroft Oil, 2006 ND 121 ¶ 11, 615 N.W.2d 153 (citing Russell v. Bank of Kirkwood Plaza, 386 N.W.2d 892, 896 (N.D. 1986).  The promise must be clear, definite, and unambiguous as to essential terms before the doctrine of promissory estoppel may be invoked.  Id. (citing Lohse v. Atlantic Richfield Co., 389 N.W.2d 352, 357 (N.D. 1986).

Berg represented and warranted to Nelson that Wells Fargo would enter into a replacement promissory note transaction with Nelson in which County 20 would be the replacement borrower, the indebtedness would be the Precision Equipment indebtedness paid off by Nelson on December 31, 2008, and the collateral for the loan would be a previously constructed building in which Wells Fargo had a mortgage upon, having a value in excess of the indebtedness outstanding to Wells Fargo.  (Nelson Depo., pp. 149 – 154).  The parties further agreed that the replacement loan documents would be prepared by mid-January 2009, by Wells Fargo.  Id.  The parties did not discuss the rate of interest because of the portability of the swap agreement, 6.1% fixed.  (Berg Depo., 8/23/10, p. 58).  Nelson advised Berg that he would obtain a bridge loan to pay off Precision Equipment's obligation outstanding to Wells Fargo premised upon Wells Fargo entering a new loan transaction with County 20 in mid-January 2009. (Nelson Depo., pp. 155-157).  It did not make financial sense for Nelson to pay the Precision Equipment note and have a continuing obligation under the International Swap Dealer Agreement without Nelson having an obligation outstanding to Wells Fargo.  (Nelson Depo., p. 97).  The tax savings Nelson received by paying off the Precision Equipment debt outstanding to Wells Fargo did not exceed Nelson's future obligations under International Swap Dealer Agreement since Nelson did not have

matching indebtedness under the swap agreement.  Id.  Nelson paid off in full, Precision Equipment's indebtedness outstanding to Wells Fargo before December 31, 2008. (Nelson Depo., p. 154).  Wells Fargo knew that Nelson changed his position based on Berg's promise by Wells Fargo accepting Nelson's payment of the Precision Equipment indebtedness in full.  The first element of promissory estoppel is established and there are no genuine issues of material fact concerning this.

The second element of promissory estoppel is also satisfied.  Had Berg and Wells Fargo not promised and warranted to replace the Precision Equipment note with County 20, Nelson would never have paid in full the Precision Equipment loan. Nelson's tax savings by paying the Precision Equipment loan off in full December 31, 2008, did not justify making payments on the swap agreement without underlying indebtedness outstanding to Wells Fargo.  (Nelson Depo., p. 97).  Importantly, Nelson knew that there was no advantage to him paying off the Precision Equipment loan at Wells Fargo, without having any other indebtedness outstanding to Wells Fargo and still being obligated under the swap agreement.  (Nelson Depo., p. 97).  Nelson paid off the Precision Equipment loan premised upon the representation and warranties of Berg and Wells Fargo that Wells Fargo would replace the Precision Equipment note with a new County 20 promissory note with the same terms and conditions as the Precision Equipment loan.  (Nelson Depo., pp. 150-152).  As such, the second element of promissory estoppel is established.

The third element, justifiable reliance, is also satisfied.  Nelson's actions were based on Berg's and Wells Fargo's promise to enter into a replacement loan transaction transferring the existing debt from Precision Equipment to County 20.  (Nelson Depo.,

16

pp. 149 – 153).   Relying on Berg's representation that Wells Fargo could not process the transaction within Nelson's timeframe (before year end 2008), Nelson obtained a 90 day bridge loan from the State Bank of Fargo.  (Nelson Depo., pp. 152, 157).  It would not make financial sense for Nelson to take this step had he not been assured that Berg and Wells Fargo would enter into a loan with County 20 for the same terms and conditions as a Precision Equipment loan to run concurrently with the swap agreement. (Nelson Depo., p. 97).  Justifiable reliance has been demonstrated.

The final element, injustice, which can only be avoided by enforcing a promise, is also satisfied.  In this case, the facts establish that given the economic climate at the end of 2008 and the beginning of 2009, Wells Fargo imposed new lending requirements.  (Nelson Depo., p. 167).  (Knapp Depo. p. 119).  In late December of 2008 and early January 2009, well after Bob Nelson was informed that Wells Fargo would honor the portability of his swap agreement, replacing the Precision Equipment loan in December, 2008, with a County 20 loan and County 20 collateral, Wells Fargo issued a mandate that all loans must bear 5% interest.  (Knapp Depo., p. 119).  Brian Knapp further testified that there was no exceptions to the rule.  Id.  When Bob Nelson approached Scott Berg in early January 2009 regarding the status of Wells Fargo preparing the replacement County 20 loan documentation so Bob Nelson could pay off his bridge loan to State Bank of Fargo, Bob Nelson was informed that interest rates had escalated, that Wells Fargo would not honor the parties' swap agreement and portability, and the interest rate would now be between 8.7% and 9.3%.  (Nelson Depo., p. 166).  Bob Nelson was shocked and dismayed.  Id.

Nevertheless, Bob Nelson agreed to enter into a loan transaction with Wells Fargo at the higher rate of interest; however, Wells Fargo refused and continued to refuse to enter into any loan transaction with Bob Nelson.  (Nelson Depo., p. 177).  It appears that Wells Fargo refused to enter into a loan transaction with Bob Nelson because of Judd Graham's, the President of Wells Fargo Moorhead, Minnesota, mistaken belief that Bob Nelson went from a top 10 best Wells Fargo customer to not being a customer in late December 2008, early January 2009.  (Judd F. Graham Depo., 8/23/10, pp. 64 – 65, attached hereto as Exhibit F).  Judd Graham understood that Bob Nelson was a top 10 customer of Wells Fargo Bank because Bob Nelson had hundreds of thousands of dollars on deposit with Wells Fargo and had loans with Wells Fargo as evidenced by the swap agreement.  (Graham Depo., pp. 17 - 19).  In late December 2008, Judd Graham believed that Bob Nelson had withdrawn his funds on deposit with Wells Fargo and by paying off the Precision Equipment loan based upon Bob Nelson's conversations with Scott Berg, Bob Nelson no longer had any indebtedness with Wells Fargo.  (Graham Depo., pp. 63 - 65).  Wells Fargo then believed that Bob Nelson had transferred his business and followed his previous banker, Dan Staller.  Id.  It appears that Wells Fargo decided not to honor its agreement with Bob Nelson and enter into a new loan transaction with County 20 in January of 2009 under the mistaken belief that Bob Nelson was no longer a valued customer of Wells Fargo.  Id.  Bob Nelson testified that he still had hundreds of thousands of dollars on deposit with Wells Fargo and that he wanted to continue his relationship with Wells Fargo but they chose not to do so. (Nelson Depo., pp. 152-154).  Due to Wells Fargo's change of position, Bob Nelson had to finance with another lender the State Bank of Fargo bridge loan in the amount of

18

$2,150,000.00.  (Nelson Depo., pp, 157, 158).   By doing so, Bob Nelson's swap agreement remained a liability without any corresponding debt.   Wells Fargo's calculation of an interest rate in excess of 9% was premised upon Wells Fargo locally receiving 5% under the swap agreement, Bob Nelson being assessed approximately 3.92% for a total interest rate of 8.92%.  (Knapp Depo., p.114).

Nelson has satisfied all of the elements of promissory estoppel.  This Court should decree that due to the actions and inactions of Wells Fargo, Nelson has no further obligation under the International Swap Dealer Agreement and that the agreement is hereby void.  This Court should further enter judgment in favor of Nelson and against Wells Fargo returning to Nelson the Swap Dealer Agreement payment ACH from Nelson's account in February, March, April and May, totaling the sum of $33,585.49.

North Dakota Century Code § 31-11-06 provides that when a person, by that person's own declaration, act or omission, intentionally and deliberately has led another to believe a particular thing to be true and to act upon such belief, that person shall not be permitted to falsify it in any litigation arising out of such declaration, act or omission. In the case of Kouba vs. Great Plains Palleting, Inc., 372 N.W.2d 884, 886-887 (N.D. 1985), the court recognized that the party asserting estoppel has the burden of proving each element.  See also Johnson vs. Northwestern Bell Telephone Company, 338 N.W.2d 622, 625 (N.D. 1983).  The well established elements of estoppel are:

      1.    Lack of knowledge and the means of knowledge of the truth as to the facts in question;

2. Good faith reliance upon the conduct or statement of the defendants; and

3. The plaintiff's action or inaction based thereon resulting in the change of position causing the plaintiff injury.  The doctrine of estoppel is designed to prevent a party from unfavorably benefiting from his own actions.  Rosenberg vs. Townsend, Rosenberg & Young, Inc., 376 N.W.2d 434, 437 (Minn. App. 1985).

Estoppel is substantive law – that it absolutely precludes a party from asserting but otherwise would be his right.  Suske vs. Straka, 39 N.W.2d 745, 750-51 (Minn. 1949).  Estoppel may be asserted in an action in law or equity.  In order to do justice, the facts are taken as those which the parties estop from denying.  The Suske court observed that it is an elementary law that one who, either intentionally or through culpable negligence by silence when the party should speak out or by his acts and representations induces another to believe that certain facts exist, is estopped to deny the existence of such facts were to do so would prejudice the other party.  Id.  The focus is not what the party against whom estoppel is asserted actually meant but the party asserting the doctrine of estoppel might have reasonably inferred from the other party's action or representations.  Id.; See also Clover vs. Patterson, 281 N.W. 275, 278-279 (Minn. 1938).  The court in Laughlin vs. Hall, 20 N.W.2d 415, 416-17 (Iowa 1945), recognized that equitable estoppel is premised upon grounds of public policy, fair dealing, good faith, justice, and its purpose is to forbid one to speak against his own act, representation, or comments to injure one to whom they are directed and the one who reasonably relied upon them.  See also Holt vs. Stofflet, 61 N.W.2d 28 (Mich. 1953);

Village Wells vs. Layne-Minnesota Company, 60 N.W.2d 621 (Minn. 1953); Neset vs. Rudman, 74 N.W.2d 826 (N.D. 1956).  The evidence is uncontradicted:

1.  Nelson was induced to enter into an International Swap Dealer Agreement with Wells Fargo because it produced the lowest fixed rate of interest and  because of its portability – ability to utilize a swap with other indebtedness;

2.  That Nelson in May 2008 utilized the swap with a County 20 Storage & Transfer indebtedness in the approximate amount of $2,450,000.00;

3.  That in September 2008, the indebtedness was swapped/transferred to Precision Equipment Manufacturing of North America for the identical indebtedness;

4.  That Nelson sought to transfer/swap the loan from Precision Equipment back to County 20 in December 2008.  (Nelson Depo., pp. 149, 150);

5.  Scott Berg, a commercial banker with less than 11 months of experience, agreed that Bob Nelson could transfer the Precision Equipment loan with Wells Fargo Bank back to County 20 Storage & Transfer and that the loan would be secured by a building that Wells Fargo was familiar with and previously utilized as collateral. (Nelson Depo., pp. 151, 152);

6.   That Scott Berg represented it would take two (2) to three (3) weeks to prepare the loan documentation and he lacked the ability to do so by December 31, 2008.  (Nelson Depo., p. 151);

7.   Bob Nelson desired to pay off the Precision Equipment loan at Wells Fargo Bank in order to take tax benefits; (Nelson Depo., pp. 138, 139);

8.   That Bob Nelson and Scott Berg agreed to the terms and conditions that Wells Fargo would replace existing Precision Equipment loan by transferring the same to County 20 Storage & Transfer for the identical balance of the loan indebtedness, with the same terms and conditions, and that the debt would mirror the existing agreement between Wells Fargo and Precision Equipment. (Nelson Depo., pp. 159-151).   The parties did not discuss the interest rate, since the parties all knew that the interest rate was 6.1% fixed pursuant to the swap agreement.   Scott Berg is estopped from now asserting the parties failed to agree to all essential terms and conditions - the interest rate.   The parties discussed all the essential terms and conditions of the replacement loan and the fact that the loan would be transferred under the same terms and conditions to County 20.  (Nelson Depo., pp. 149, 150). The parties' previous course of dealing demonstrated the portability of the swap agreement as indicated in the interest rate presentation.  (Staller Ex. 5, <u>Exhibit H</u>).   The parties' previous

course of dealing demonstrated that the loan which originated with County 20 was transferred to Precision Equipment seamlessly and that Nelson sought a seamless retransfer back to County 20;

9.   In December 2008, the Wells Fargo Moorhead branch was receiving interest payments of LIBOR plus 1.4%.   LIBOR had significantly declined from the date of inception, November 2007, at 4.7% to December 2008, at 1.0%.  In December 2008, Wells Fargo locally was receiving interest of LIBOR plus 1.4% or 2.4%.   Under the swap agreement, Wells Fargo nationally was receiving the difference 3.75% (6.1% less 2.4%).

10.   Bob Nelson paid off his Wells Fargo Precision Equipment loan December 31, 2008, based upon the representations, statements, and actions and inactions of Scott Berg.  Bob Nelson obtained a 90 day bridge loan from State Bank of Fargo to pay off said indebtedness.  (Nelson Depo., p. 160);

11.   Bob Nelson contacted Scott Berg on or about January 14, 2009, to inquire as to the status of the loan documents being prepared to transfer the loan from Precision Equipment to County 20.  (Nelson Depo., p. 164);

12.   For the first time ever, Bob Nelson was informed on or about January 16, 2009, that Wells Fargo could no longer honor its swap agreement and fixed rate of interest at 6.1% and that the loan

23

interest rate would now be in excess of 8.7% - 9.3%.  (Nelson Depo., p. 166);

13. Pursuant to Brian Knapp's testimony, a Wells Fargo derivative specialist, Wells Fargo mandated in late December 2008 and early January 2009 that all commercial local loans must have an interest rate of at least 5%.  (Knapp Depo., p. 119).  By demanding 5% at Wells Fargo Moorhead and when adding the swap agreement interest rate, Bob Nelson's now proposed loan at Wells Fargo in January 2009 would bear an interest rate between 8.7 and 9.3. (Nelson Depo., pp. 177-179);

14. That Nelson reasonably relied upon the representations of Berg in paying off the Precision Equipment loan with a State Bank of Fargo 90 day bridge loan in reliance of replacing the Precision Equipment loan with a loan in the name of County 20 with identical terms and conditions and for the remaining life of the swap agreement. (Nelson Depo., pp. 155-157);

15. Due to Wells Fargo representatives, namely Scott Berg's, representations, statements, actions and inactions, Bob Nelson paid off his existing indebtedness with Wells Fargo with the understanding that similar indebtedness would be procured within two (2) to three (3) weeks in the name of County 20.  (Nelson Depo., pp. 153-154);

24

16.   But for Wells Fargo's representations and statements, Bob Nelson would not have paid off his indebtedness at Wells Fargo and would today still have a separate indebtedness under the swap agreement; and

17.   The benefits Bob Nelson received by paying off the Precision Equipment indebtedness did not outweigh the detriment caused by any remaining liability under the swap agreement without corresponding indebtedness outstanding to Wells Fargo.  (Nelson Depo., p. 97).

Pursuant to case law cited herewithin, Scott Berg, a representative of Wells Fargo, by his declarations, acts, intentionally and deliberately led Bob Nelson to believe a particular thing to be true, Bob Nelson could pay off the Precision Equipment loan and procure within two (2) to three (3) weeks an identical loan with identical terms and conditions in the name of County 20 and Wells Fargo should not be able to retract its acts and omissions.  Such is the principle of equitable estoppel.  N.D.C.C. § 31-11-06.  Such is the principal announced in Suske, 39 N.W.2d at 750-751.  Estoppel prevents Wells Fargo from now denying that the parties did not have a meeting of the minds.  Pursuant to Suske, Wells Fargo, by intentionally or through culpable negligence, including silence, had a duty to discuss interest rates if such was not previously agreed by the parties through the parties' course of dealing or mutual understanding of the portability of the swap agreement.  Scott Berg's actions, representations, and inactions induced Bob Nelson to believe that he could pay off the Precision Equipment loan, and within weeks have an identical loan with Wells Fargo in the name of County 20.  Wells

25

Fargo is now estopped to deny the existence of said facts.  The Doctrine of Estoppel examines what Bob Nelson might have reasonably inferred from Scott Berg's actions, or inactions, or representations, and silence.  Id.; See also Clover, 281 N.W.2d at 278.  The purpose of estoppel is to forbid Wells Fargo to take an action contrary to its own actions, representations, or commitment thus injuring Bob Nelson, the party to whom said actions, representations, and commitments were reasonably relied upon.

The Laughlin court recognized that estoppel was based upon grounds of public policy, fair dealing, good faith and justice, and its purpose is to forbid Wells Fargo to speak against its own acts, representations or commitments to injure Bob Nelson, whom such acts, representations and commitments were directed to and whom reasonably relied upon the same.  20 N.W.2d at 416-417.

The present cause of action is distinguishable from North Dakota cases that have examined whether the plaintiff was entitled to relief under promissory estoppel.   In Russell vs. Bank of Kirkwood Plaza, 386 N.W.2d 892, 893 (N.D. 1996), the court found that promissory estoppel could not be invoked because the plaintiff did not substantially change his position nor did the plaintiff establish justifiable reliance.   In the present cause of action, the evidence is clear that Bob Nelson substantially changed his position – paid off the Precision Equipment loan and procured a 90 day bridge loan waiting for Wells Fargo to prepare the appropriate documentation to transfer the Precision Equipment loan to County 20.

The present cause of action is also distinguishable from the case of Lohse vs. Atlantic Richfield Co., 389 N.W.2d 352 (N.D. 1986), where the court held that promissory estoppel was not applicable because there was no discussion between the

parties regarding the essential terms of a contract.  In the present cause of action, all the essential terms of the contract were discussed.  The essential terms of the contract included an agreement between the parties:

1.  Bob Nelson would pay off the Precision Equipment loan outstanding to Wells Fargo before its close of business December 31, 2008.  (Nelson Depo. pp. 156, 157);

2.  That Wells Fargo would prepare new loan documents in 2 – 3 weeks in which County 20 would be the borrower for the identical amount that Bob Nelson had paid Wells Fargo to pay off the Precision Equipment loan.  (Nelson Depo., pp. 151 - 152);

3.  That Bob Nelson could expect the loan documents to be prepared during the week of January 9, 2009.  (Nelson Depo, pp. 152, 153); and

4.  That the County 20 loan would contain the same terms and conditions as the existing Precision Equipment loan including under the swap agreement, a fixed rate of interest of 6.1% and the local loan with Wells Fargo being paid at LIBOR plus 1.4%.  (Nelson Depo., pp. 149-151).

For the reasons cited herewithin, Wells Fargo is estopped from asserting that an agreement was not reached between the parties – Bob Nelson would pay off the Precision Equipment loan in excess of $2,450,000.00 to Wells Fargo and Wells Fargo would enter into a substitute loan transaction with Bob Nelson's related company,

County 20 Storage & Transfer, for the same terms and conditions as the Precision Equipment loan.

Berg asserts that the parties did not discuss interest rates until January, 2009, and thus, no meeting of the minds occurred.  (Berg Depo., 8/23/10, p. 58).  Berg's assertions are contrary to the parties' understanding.  Moreover, Berg had a duty to inform Nelson that a different rate of interest would be charged.  Pursuant to the decision rendered in Farmers Union Centurion Exchange, Inc. vs. Reliance Insurance Company, 626 F. Supp. 583 (D. N.D. 1985), the court held that false representation occurs in the form of a suppression of a fact which one party, in this case, Wells Fargo, has a legal or equitable obligation to communicate to another, Robert Nelson, and fails to do so.  If in fact the interest rate was to change and Berg suppressed said fact, a false representation has occurred.

In the case of Minex Resources, Inc. vs. Morland, 518 N.W.2d 682 (N.D. 1994), the court held that a party can be equitably estopped from denying a certain fact if a party has actual constructive knowledge of the true facts, the party's knowledgeable that the opposing side lacks the knowledge of the facts asserted, and that the party lacking the information relies in good faith upon the other party's conduct.

In the case of Ray Co., Inc. vs. Johnson, 325 N.W.2d 250 (N.D. 1982), the court recognized that although silence alone does not suffice to give rise to an equitable estoppel argument, the court recognized that equitable estoppel will be invoked when a party, under the circumstances, has the duty to speak out, the party is aware that the other side reasonably relied upon such silence, and resulting prejudice occurs.

28

For the reasons cited herewithin, this Court should grant Nelson summary judgment on his Complaint decreeing that Nelson has no obligation to Wells Fargo under the International Swap Dealer Agreement.  Moreover, this Court should enter a monetary judgment in favor of Nelson and against Wells Fargo for the swap dealer agreement payments Wells Fargo debited from Nelson's accounts for the months of February through May 2009, in the total amount of $33,585.49.

**C.**     **The Statute of Frauds is Inapplicable.**

Wells Fargo may assert that the Statute of Frauds prevents Nelson from obtaining relief.  Section 9-06-04(4), N.D.C.C., provides that an agreement or promise for the lending of money in an aggregate amount of $25,000 or greater must be in writing.  Case law pursuant to N.D.C.C. § 9-06-04 provides that part performance of an oral contract removes the oral contract from the statute of frauds as long as the part performance is consistent with the existence of the alleged contract.  Poyzer vs. Amenia Seed & Grain Co., 409 N.W.2d 107 (N.D. 1987); Vasichek vs. Thorsen, 271 N.W.2d 555 (N.D. 1978).  In the case of Poyzer, the senior mortgagee was eager for the mortgagor to find outside sources of capital.  The junior mortgagee had a title opinion rendered which did not disclose any prior mortgages, and thus, the junior mortgagee lent the mortgagor $90,000.00 which was paid to the senior mortgagee.  The junior mortgagee would not have loaned the money to the mortgagor without receiving a first mortgage. The junior mortgagee fully performed its part of the agreement by lending a total of $90,000.00 which the court found constituted sufficient part performance of the oral subordination agreement to remove the parties' agreement from the operation of the statute of frauds.  The senior mortgagee asserted that the $90,000.00 was only a partial

payment and that the senior mortgagee was not obligated to release its paramount and superior mortgage upon the premises.

A similar result was reached in the case of <u>Williston Cooperative Credit Union vs. Fossum</u>, 459 N.W.2d 548 (N.D. 1990), where the court recognized that although the general rules that contracts for the sale of real property and transfers of real property interest must be made by an instrument in writing, part performance of an oral contract which is consistent only with the existence of the alleged contract removes any requirement that the parties' agreement be in writing.  The same result was reached in the case of <u>Vasichek vs. Thorsen</u>, 271 N.W.2d 555 (N.D. 1978), where the court found that sufficient evidence existed to establish part performance of an oral agreement to sell real estate to remove the agreement from the requirements/statute of frauds that the agreement be in writing.  The court found that the purchasers under the alleged oral agreement constructed permanent grain bins on the property, summer-fallowed the land, improved drainage ditches, possessed and farmed the land, paid property taxes on the land and were not charged rent for their occupancy.

In the present cause of action, Wells Fargo presented Nelson with an interest rate presentation regarding International Swap Dealer Agreement dated October 23, 2007.  The document provides that the benefits of a swap agreement including portability.  (Staller Ex. 5, <u>Exhibit H</u>).  Wells Fargo defined portability occurring if a loan was prepaid, the swap can be used to fix the rate on other floating rate obligations Nelson may have.  In the present cause of action, Wells Fargo and Nelson came to an agreement consistent with the portability representations made by Wells Fargo and consistent with the parties' previous course of conduct and dealings.  Pursuant to the

parties previous course of dealings, Nelson requested loans be transferred from one entity to another entity and Wells Fargo agreed premised upon having sufficient collateral and/or a guarantor.   This occurred in July 2008.   Wells Fargo honored Nelson's request and the parties consummated a transfer of indebtedness from County 20 to Precision Equipment in September 2008.   In December 2008, Nelson once again requested portability by transferring the indebtedness from Precision Equipment to County 20 pursuant to identical terms and conditions, but conditioned upon acceptable collateral to Wells Fargo.   The parties agreed the acceptable collateral was the building previously subject to a Wells Fargo's mortgage and previously appraised by Wells Fargo which had a value greater than the indebtedness outstanding to Wells Fargo. Due to the representations, statements, actions, and inactions of Wells Fargo and the parties' previous course of conduct, Nelson substantially performed under the parties' agreement.    Nelson's substantial performance included paying off the Precision Equipment loan outstanding to Wells Fargo with a 90 day bridge loan acquired from State Bank of Fargo, and patiently waiting for Wells Fargo to prepare loan documents over a period of 2 to 3 weeks replacing County 20 as the borrower and replacing the collateral with a County 20 preexisting and fully constructed building.    Nelson's performance removed the parties' agreement from any requirement that the agreement be expressed in writing.   Robert Nelson and Scott Berg came to an agreement in December 2008.  Bob Nelson was paying off the Precision Equipment loan outstanding to Wells Fargo.  (Nelson Depo., pp. 156, 157).  Wells Fargo would prepare new loan documents for County 20 Storage with identical amount and balance outstanding as the Precision Equipment loan to Wells Fargo, (Nelson Depo., pp. 149, 150).  Nelson in fact

did pay off the Precision Equipment loan with a bridge loan from State Bank of Fargo. The parties agreed that in the early part of January 2009, Wells Fargo would prepare substitute loan documents in which County 20 would be obligated to Wells Fargo in the identical amount as the Precision Equipment loan paid off by Nelson in December 2008. (Nelson Depo., pp. 152, 153).  The terms and conditions of the County 20 loan would be identical to Precision Equipment loan.  (Nelson Depo., pp. 149, 150).  At no time did Scott Berg ever state that the interest rate would increase.

The rationale for the County 20 loan never coming to fruition was caused by Wells Fargo corporate in late December 2008 and early January 2009 proclaiming a policy that no commercial loan at any local Wells Fargo Bank would bear interest of less than 5%.  (Knapp Depo., pp. 112, 117).  Brian Knapp, one of five people in Wells Fargo's Minneapolis, Minnesota, derivative department, testified that upon issuing said policy, the sale of swaps at Wells Fargo came to a screeching halt.  (Knapp Depo., p. 120).  Knapp testified that the sale of swap agreements in the beginning months of 2009 were very few.  (Knapp Depo., p. 120).   Brian Knapp was laid off from his position at Wells Fargo on or about September 10, 2010, because of lack of sales.  (Knapp Depo., p. 24).  Brian Knapp testified that Wells Fargo's requirement of the 5% rate of interest on all loans was irregardless of competition, present interest rates, and no exceptions would be granted.  (Knapp Depo., pp. 120-121).  Wells Fargo breached the parties' agreement which is outside the statute of frauds by not entering into a subsequent loan transaction with Bob Nelson.  The breach occurred because Wells Fargo corporate offices instituted a loan policy affecting the parties' agreement.  The loan policy provided

for no exceptions.  Bob Nelson's interest rate with Wells Fargo was to increase from 6.1% fixed in an amount in excess of 8.7% - 9.3%.  (Nelson Depo., p. 179).

For the reasons cited herewithin, the statute of frauds is inapplicable.  For the reasons cited herewithin, Bob Nelson is entitled to summary judgment for the relief requested in his Complaint.

### D.   Wells Fargo's Habit and/or Routine Practices Also Establish that Plaintiff is Entitled to Summary Judgment

"Generally, habit evidence is highly persuasive as proof of conduct on a particular occasion, and its admission depends on the 'degree of regularity of the practice and its coincidence with the occasion.'"  Loughan v. Firestone Tire & Rubber Co., 749 F.2d 1519, 1524 (11th Cir. 1985) (citing McCormick on Evidence, § 195, n.16)).  Rule 406 provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

N.D. R. Evid. 406.  "Evidence of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the organization on a particular occasion was in conformity with the routine practice."  Home Ins. Co. v. Kresser Nationwide Truckload Servs., Inc., 1994 WL 662601 *8 (N.D. Ill. 1994).  "The Rule does not limit proof of specific instances to testimony by witnesses with personal knowledge; it permits resort to circumstantial evidence, documents, or even opinion testimony."  Id.  "Although reluctant to admit evidence of the habits of individuals, courts are more receptive to such evidence

33

regarding business customs because of the minimal likelihood that individuals will remember one of a large number of repeated transactions."  Id.

"Habit in modern usage is described as 'a tendency to act in a certain way or to do a certain thing; usual way of acting; custom; practice[.]'"  Meyer v. United States, 464 F.Supp. 317, 321 (D. Colo. 1979) (citation omitted).  "In the context of Rule 406, habit is an . . . *organization's practice of handling a particular kind of situation with a specific type of conduct*."  Id. (emphasis added).  "Habit is one's regular response to a repeated specific situation."  Id. (citing McCormick on Evidence, § 195 (2d ed. 1972)).

"Courts generally apply a more liberal standard to evidence of office routine than they apply to evidence of personal habit because there is no concern that the evidence could be used improperly as character evidence."  29 Am. Jur. 2d Evidence § 403.  "[T]he office routine must be relatively simple, involve little judgment, and not be susceptible to too much variation."  Id.  "[C]ourts are inclined to leniency when it comes to the admission of evidence of routine business practice, because such practices are often relied upon by other businesses and are derived from concerted planning activities driven by economic concerns about efficiency which are of necessity more regimented than individual conduct."  Id.

Wells Fargo convinced its customers to enter into these "swap" agreements asserting the benefits were fixed rates of interest and portability.  Wells Fargo's corporate mandate late December, 2008, and early January, 2009, not only prohibited Nelson's utilization of the swap agreement's portability but also another Wells Fargo customer, Dell L. Arneson.  This habit/routine is evidenced by the deposition testimony

of Dell L. Arneson ("Arneson"), which was taken by Plaintiff's counsel on September 13, 2010.

Arneson is not a party to this litigation and is not a factual witness in this matter. Arneson was deposed to establish Wells Fargo's habit, routine, statements against interest, and other relevant grounds.  Arneson is a businessman in the Fargo/Moorhead area who was persuaded by Wells Fargo to enter into Wells Fargo swap agreements. Arneson's experience with Wells Fargo swap agreements was identical to Nelson's experiences, thus establishing Wells Fargo's habit/routine in convincing its customers to enter these swap agreements.

Arneson testified that he spoke to Nelson, and the two quickly realized that their experiences with the swap agreements and Wells Fargo were the same.  (Arneson Depo., p. 51).  Like Nelson, Arneson believed that by entering into a swap agreement, Arneson could obtain a fixed rate until the time period for the swap agreement was due and that the swap agreements could always be paid off.  Arneson asserts he was never told of any penalties or termination fees for early payoff.  (Arneson Depo., pp. 52-53). Arneson, much like Nelson, was informed in the spring of 2009 that to substitute borrowers or collateral utilizing the exact swap, it would require an increase in interest rates.  (Arneson Depo., p. 52).  Nelson and Arneson came to realize that the same representations were made to each of them by Wells Fargo were false and contrary to the sales presentation regarding the benefits of swap agreements.  (Arneson Depo., p. 53).  Before Wells Fargo changed its loan rate policy in December 2008/January 2009, both Arneson and Nelson were able to swap properties and swap borrowers without any change in interest rates.  Suddenly, the rules changed and both Nelson and Arneson

were not allowed to continue on with the course of dealing that they each had established with Wells Fargo.  (Arneson Depo., pp. 54-55).

Arneson's testimony establishes a routine business practice of Wells Fargo. "Evidence of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the organization on a particular occasion was in conformity with the routine practice." Home Ins. Co., 1994 WL 662601 *8.  Rule 406 "does not limit proof of specific instances to testimony by witnesses with personal knowledge; it permits resort to circumstantial evidence, documents, or even opinion testimony." Id.

## VI.   CONCLUSION

For reasons cited herewithin, this Court should grant Nelson summary judgment on this Complaint decreeing that Nelson is not indebted to Wells Fargo under the International Swap Dealer Agreement and that Wells Fargo is indebted to Nelson for the International Swap Dealer Agreement payments electronically debited from his account for the months of February through May 2009 in the amount of $33,585.49.

Dated this 29th day of October, 2010.


/s/ Brad A. Sinclair
Brad A. Sinclair (ND #04225)
Serkland Law Firm
10 Roberts Street
P.O. Box 6017
Fargo, ND  58108-6017
(701) 232-8957
*Attorneys for Plaintiffs*