UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| County 20 Storage &  Transfer, Inc., and | ) | |
| Robert L. Nelson, as successor in interest | ) | |
| To Precision Equipment Manufacturing | ) | CIVIL NO. 3:09-CV-104 |
| of North America, Inc., | ) | |
| | ) | |
|            Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| Wells Fargo Bank, N.A., | ) | |
| | ) | |
|            Defendant. | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**SCOTT J. LANDA,** (ND ID #04808)
scottlanda@northdakotalaw.net
**JOHN S. FOSTER,** (ND ID #03300)
johnfoster@northdakotalaw.net
Zimney Foster P.C.
3100 S. Columbia Road, Ste 200
P.O. Box 13417
Grand Forks, ND 58208-3417
Phone:701.772.8111 Fax: 701-772-7328
ATTORNEYS FOR DEFENDANT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

I.      INTRODUCTION ............................................................................... 1

II.     PROCEDURAL HISTORY .................................................................. 1

III.    FACTS RELIED UPON ...................................................................... 2

IV.     STATEMENT OF DISPUTED MATERIAL FACTS REQUIRING TRIAL ................. 9

V.      LAW AND ARGUMENT .................................................................... 22

        A.      Summary Judgment Standard .............................................. 23

        B.      There are Numerous Questions of Fact Which Preclude Entry of Summary
                Judgment on the Grounds of Promissory Estoppel ................................. 23

                1.      A promise ................................................................. 24

                2.      Substantial change of position .................................. 26

                3.      Justifiable reliance .................................................... 27

                4.      Injustice ................................................................... 29

        C.      The Doctrine of Equitable Estoppel Does Not Provide Grounds for
                Affirmative Relief for the Plaintiffs ...................................................... 31

        D.      The Statue of Frauds is Applicable to This Case .................................. 33

        E.      Dell Arneson's Testimony is Inadmissible to Prove Wells Fargo's Routine
                Practice ..................................................................................... 37

VI.     CONCLUSION ............................................................................... 40

i

# <u>TABLE OF AUTHORITIES</u>

I.      INTRODUCTION

II.     PROCEDURAL HISTORY

III.    FACTS RELIED UPON

IV.     STATEMENT OF DISPUTED MATERIAL FACTS REQUIRING TRIAL

        Rule 7.1, U.S. District Court for the District of North Dakota ............................................9

V.      LAW AND ARGUMENT

        A.      **Summary Judgment Standard**

                *Kern v. Tri-State Ins. Co.*, 386 F.2d 754 (8th Cir. 1967) ........................................23
                *Shelter Ins. Companies v. Hildreth*, 255 F.3d 921 (8th Cir. 2001) ........................23

        B.      **There are Numerous Questions of Fact Which Preclude Entry of Summary
                Judgment on the Grounds of Promissory Estoppel**

                *Fortman v. Manthey*, 248 N.W.2d 821 (N.D. 1976)..............................................23
                *Gorley v. Parizek*, 475 N.W.2d 558 (N.D. 1991) ..................................................23
                *Peterson Mechanical, Inc. v. Nereson*, 466 N.W.2d 568 (N.D. 1991) ..................23
                *Russell v. Bank of Kirkwood Plaza*, 386 N.W.2d 892 (N.D. 1986)......................24

                1.      **A promise**

                        *Karch v. Equilon Enterprises, LLC*, 286 F. Supp. 2d, 1075 (D.N.D.
                        2003) ................................................................................................25, 25
                        *Lohse,* 389 N.W.2d 357 ................................................................24, 26
                        *University Hotel Development, LLC v. Dusterhoft Oil, Inc.* 2006 ND
                        121, 715 N.W.2d 153................................................................................24

                2.      **Substantial change of position**

                        *Russell*, 386 N.W.2d 896 ........................................................................27

                3.      **Justifiable reliance**

                4.      **Injustice**

        C.      **The Doctrine of Equitable Estoppel Does Not Provide Grounds for
                Affirmative Relief for the Plaintiffs**

*Karch v. Equilon Enterprises, LLC*, 286 F. Supp. 2d, 1075 (D.N.D. 2003)..........32

North Dakota Century Code § 31-11-06................................................................32

**D.      The Statue of Frauds is Applicable to This Case**

*Anheluk v. Ohlsen*, 390 F.Supp.2d 865 (D.N.D. 2005)......................................35

*First State Bank of Goodrich v. Oster*, 500 N.W.2d 593 (N.D. 1993) .................36

*Johnson Farms v. McEnroe*, 1997 ND 179, 568 N.W.2d 920.............................34

North Dakota Century Code § 9-06-04.........................................................33, 34

*Poyzer v. Amenia Seed & Grain Co.*, 409 N.W.2d 107 (N.D. 1987) ...................35

**E.      Dell Arneson's Testimony is Inadmissible to Prove Wells Fargo's Routine Practice**

*Loughan v. Firestone Tire & Rubber Co.*, 749 F.2d 1519 (11th Cir. 1985).....38, 39

*Mobil Exploration and Producing U.S., Inc. v. Cajun Construction Services, Inc.*, 45 F.3d 96 (5th Cir. 1995) ...............................................................39

Rule 406, Federal Rules of Evidence..................................................................38

*Westport Ins. v. Ray Quinney & Nebeker*, 2010 WL 2521460 (D. Utah)..............39

**VI.    CONCLUSION** ..............................................................................................

## INTRODUCTION

Wells Fargo Bank, N.A., ("Wells Fargo") herein respectfully submits its Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment.   This Memorandum is accompanied by a Statement of Disputed Material Facts Requiring Trial.

## PROCEDURAL HISTORY

On November 4, 2009, the Plaintiffs served their Amended Complaint in this matter. Therein, they asserted six separate causes of action which included, Count 2, Promissory Estoppel, the cause of action upon which the pending dispositive motion is based.  The factual premise alleged in the Amended Complaint is that as a result of conversations with Wells Fargo representatives, Nelson was induced to believe that the "original Wells Fargo loan of November 7, 2007" would be transferred back to County 20 under the original terms and conditions. Docket #1, ¶ 17.

On December 4, 2009, Wells Fargo interposed its Amended Answer and Amended Counterclaim.  Therein, Wells Fargo asserted, inter alia, that on or about May 13, 2008 Nelson and Precision Equipment executed a promissory note in favor of Wells Fargo in the amount of $2,450,000; that on June 2, 2008, Nelson and Precision Equipment entered into an International Swap Dealers Association Master Agreement together with a Schedule, Hedging Authority Resolution, Novation Agreement, Third Party DDA Authorization and Confirmation, all of which memorialize the specifics of an interest rate swap contract reached between the parties (paragraph 1 of Counterclaim); that Nelson prepaid the aforementioned note in full in late December 2008; that pursuant to the terms of the swap agreement, net payments under the agreement would continue for the term of the agreement; that Nelson continued to make his net

payments under the swap agreement for several months after prepaying the note, via a prearranged automatic debit for his checking account but beginning on June 1, 2009, Nelson and Precision refused to make the required monthly swap payments; that the swap agreement was terminated by Wells Fargo for failure to pay upon notice to Nelson and Precision; and that the loss to Wells Fargo resulting from Nelson and Precisions failure to pay equaled $217,000.00, in addition to the $53,186.55 swap payments in default.  On December 17, 2009, the Plaintiffs interposed their answer to the counterclaim wherein, among other things, they denied the existence of a June 2008 swap agreement.  Docket #10.

The Plaintiffs now bring this motion for summary judgment asserting various transactions and various obligations on the part of Wells Fargo but never even acknowledging the June 2008 swap agreement upon which the counterclaim arose.  While there are numerous questions of fact which will be discussed which preclude summary judgment, at a minimum the Plaintiff's failure to even acknowledge the operative instruments upon which this action arose, creates a significant question of fact, precluding not only summary judgment, but this Court's ability to undertake any rational analysis of the respective rights and duties of the parties.

**FACTS RELIED UPON**

Robert Nelson ("Nelson") is a successful businessman who has owned and operated numerous business enterprises throughout his life.  Deposition of Robert Nelson ("Nelson Deposition"), Exhibit A attached to Plaintiffs' Brief, p. 11, ll. 1-22; p. 12, ll. 4-7; p. 17, ll. 17-25; p. 18, ll. 1-2; p. 19, ll. 7-24; p. 20, ll. 1-3; p. 33, ll. 10-21; p. 34, ll. 18-25; p. 35, ll. 1-3; p. 37, ll. 20-25; p. 38, ll. 1-7; p. 41, ll. 1-17; p. 48, ll. 10-23; p. 46, ll. 14-25; p. 47, ll. 9-13; p. 49, ll. 24-25; p. 50, ll. 1-25; p. 51, ll. 1-19; p. 52, ll. 5-23.  He eventually formed County 20 Storage &

Transfer ("County 20") to purchase and lease property. *Id.* at p. 33, ll. 10-21; p. 34, ll. 18-25; p. 35, ll. 1-3.   In approximately 2002, Nelson started Precision Equipment Manufacturing ("Precision Equipment") to manufacture fire equipment and it evolved into a trailer manufacturing and assembly company. *Id.* at p. 48, ll. 10-23.   Nelson was described by his accountant, Mark Larson, as being a person who was sophisticated with respect to credit and financing matters.  Deposition of Mark Larson ("Larson Deposition"), attached hereto as Exhibit 1, p. 23, ll. 23-25; p. 24, ll. 1-3.

Nelson began banking with Wells Fargo's predecessor, Norwest, in approximately 1988.  Nelson Deposition, Exhibit A, p. 57, ll. 13-24.   During his time with Wells Fargo, Nelson borrowed millions of dollars.  Deposition of Daniel Staller ("Staller Deposition"), Exhibit D attached to Plaintiffs' Brief, p. 69, ll. 1-4; Deposition of Scott Berg ("Berg Deposition"), August 23, 2010, Exhibit C attached to Plaintiffs' Brief, p. 11, ll. 8-24.   Through his business entities, Nelson has entered into three separate interest rate swap agreements over the years, which shall be discussed subsequently.

In March of 2003, Nelson, through County 20, entered into his first swap agreement with Wells Fargo.  Nelson Deposition, Exhibit A, at p. 65, ll. 9-13.  The 2003 swap agreement was continued to the scheduled termination date and is not the subject of this litigation. *Id.* at p. 79, ll. 11-16.  Prior to entering into the 2003 swap agreement, Nelson was given an interest rate presentation educating him on swap agreements. *Id.* at p. 68, ll. 10-25; p. 69, ll. 1-12; Interest Rate Presentation, March 2003, Exhibit 49 to Robert Nelson's Deposition and attached hereto as Exhibit 2.

On or about November 8, 2007, Nelson entered into a second swap agreement on behalf of County 20 Storage & Transfer, Inc. ("County 20") with Wells Fargo.  ISDA Agreement,

Exhibit G attached to Plaintiffs' Brief.  Nelson decided to enter into this transaction rather than conventional financing because he wanted a lower fixed rate of interest than could have been obtained through conventional financing and he wanted to lock in the rate of interest before funding was extended.  Nelson Deposition, Exhibit A, p. 91, ll. 23-25; p. 92, ll. 1-25; p. 93, ll. 1-7.  In addition, Nelson's banker with Wells Fargo at that time, Dan Staller, testified that he discussed with Nelson yet another benefit offered by the swap: portability, i.e. the swap may by agreement of the parties be attached to other existing debt to achieve a fixed rate of interest.  Staller Deposition, Exhibit D, p. 129, ll. 20-25; p. 130, ll. 1-4; p. 147, ll. 6-12.  Staller further testified that he explained to Nelson that if new debt was incurred (as opposed to using existing debt) and the new debt did not have similar terms as the old debt, including maturity dates and interest rates, it would impact the ultimate fixed rate when paired with the swap agreement.  *Id.* at p. 85, ll. 1-11.

Prior to entering into the November 2007 swap agreement, Nelson again sat through a presentation from Wells Fargo describing the swap agreement and was offered the opportunity to answer any questions he had about the agreement.  Nelson Deposition, Exhibit A, p. 99, ll. 11-17; p. 105, ll. 22-24; Interest Rate Presentation, October 23, 2007, Exhibit 5 to Daniel Staller's Deposition and attached hereto as Exhibit 3.  Nelson testified that he did not read the November 2007 swap agreement prior to signing it nor did he have an attorney or accountant review it on his behalf.  *Id.* at p. 106, ll. 15-21.  Had he read the agreement, he would have found in bold letters the "Risk Disclosure" which, among other things warned Nelson of the risks associated with swaps, including termination fees, and advised him that this was an arm's length transaction and that Wells Fargo was not his financial advisor or fiduciary.  ISDA Master Agreement, 11-8-07, Exhibit G, p. 28.

4

On or about April 8, 2008, Nelson signed a promissory note on behalf of County 20 for the amount of $2,450,000.00 to be paired with the November 2007 swap agreement.  Promissory Note dated 4-8-08, Exhibit I attached to Plaintiffs' Brief.  The promissory note had a variable rate, but when paired with the swap agreement, a fixed 6.15% rate was obtained.   Staller Deposition, Exhibit D, p. 23, ll. 10-17.

On or about May 13, 2008, Nelson executed a promissory note on behalf of Precision Equipment Manufacturing of North America ("Precision Equipment") in the amount of $2,450,000.00.  Promissory Note dated 5-13-08, Exhibit J attached to Plaintiffs' Brief.  In June of 2008, Nelson and Precision Equipment entered into an International Swap Dealers Association Master Agreement together with a Schedule, Hedging Authority Resolution, Novation Agreement, Third Party DDA Authorization and Confirmation, all of which memorialize the specifics of an interest rate swap contract reached between the parties.  ISDA Master Agreement dated 6-2-08, Schedule and Generic Risk Disclosure, Exhibit 47 to Scott Berg's Deposition and attached hereto as Exhibit 4; Hedging Authority Resolution, Exhibit 47 to Scott Berg's Deposition and attached hereto as Exhibit 5; Novation Agreement, Exhibit 47 to Scott Berg's Deposition and attached hereto as Exhibit 6; Third Party DDA Authorization and Confirmation, 8-21-08, Exhibit 47 to Scott Berg's Deposition and attached hereto as Exhibit 7.  Again, Nelson failed to read the swap agreement prior to signing.  Nelson Deposition, Exhibit A, p. 129, ll. 5-11.

In September 2008, Nelson paid off the County 20 loan.  Berg Deposition, Exhibit C, Exhibit C, p. 30, ll. 5-7.  At this time, pursuant to the agreement of the parties, a novation agreement was signed on September 9, 2008 and the June 2008 Precision Equipment swap

agreement was paired to the May 2008 Precision Equipment note.  *Id.* at p. 38, ll. 1-4; Novation Agreement, Exhibit 6.

In either November or December of 2008, Nelson, upon the advice of his tax accountant, Mark Larson, made the decision to wind-up the business Precision Equipment.   Larson Deposition, Exhibit 1, p. 18, ll. 23-25; p. 19, ll. 1-23.  The tax savings to Nelson of winding up his business prior to the end of 2008 was approximately $200,000.  *Id.* at p. 20, ll. 2-5; Nelson Deposition, Exhibit A, p. 163, ll. 20-25.  As a part of the wind up process, Mark Larson advised Nelson to pay off the Precision Equipment note at Wells Fargo before the end of 2008.  *Id.* at p. 20, ll. 20-22.

In early December of 2008, between the 8th and the 11th, Nelson contacted Scott Berg ("Berg"), a Wells Fargo banker with whom Nelson was working at the time.  Berg Deposition, Exhibit C, p. 22, ll. 15-22.  Nelson advised Berg that Precision Equipment was looking for a tax write-off by having Precision file bankruptcy.  *Id.* at p. 24, ll. 20-25.   During this conversation Nelson informed Berg that if Wells Fargo sent a demand letter on the Precision debt, it would be paid off.  *Id.* at p. 25, ll. 14-20.  Nelson also indicated to Berg that he was interested in getting a new loan on a County 20-owned building.  *Id.* at p. 25, ll. 17-20.  This specter of bankruptcy raised a red flag for Berg and he informed Judd Graham, the market president for Fargo/Moorhead, and John Geise, the business banking manager for North Dakota and northwestern Minnesota of his conversation with Nelson.  *Id.* at 27, ll. 17-25; p. 28, l. 1.

On December 24, 2008, Nelson again contacted Berg and inquired about County 20 obtaining a new loan to pay off the Precision Equipment note in order to take advantage of tax benefits to result if Nelson could wind up Precision's business before the end of 2008.  *Id.* at p. 42, ll. 12-19.  Nelson advised Berg during this conversation that Precision Equipment would not

be filing bankruptcy.  *Id.* at p. 33, ll. 16-18.  Berg advised Nelson that the underwriting process would take several weeks and that a loan could not be extended until the credit analysis was completed.  *Id.* at 52, ll. 5-16.  Berg and Nelson did not discuss during this conversation contemplated interest rates, term of note, or any other provisions of any contemplated new loan to County 20.   *Id.* at p. 53, ll. 20-25; p. 54, ll. 1-3.   In fact, Berg testified that the swap agreement was not discussed in this conversation.  *Id.* at p. 67, ll. 19-23.

Unbeknownst to Scott Berg or any other commercial banker at Wells Fargo at the time, Nelson obtained a short-term loan from State Bank of Fargo which he used to pay off the Precision Equipment loan from Wells Fargo on December 31, 2008.  Nelson Deposition, Exhibit A, p. 157, ll. 16-24.  Prior to January 2009, Berg was not aware that Nelson planned to borrow money from another source to pay off the Precision Equipment loan by the end of 2008.  Berg Deposition, Exhibit C, p. 54, ll. 13-18.  Berg did not become aware that the Precision Equipment note had been paid off until the first or second week in January 2009.  *Id.* at p. 54, ll. 19-25; p. 55, ll. 1-2.  While the May 2008 Precision Equipment note was paid off on December 31, 2008, the June 2008 Precision Equipment swap agreement was not terminated by Nelson at this time and remained in effect until terminated by Wells Fargo in November 2009 for failure to pay. Notice of Failure to Pay dated 10-29-09, Exhibit 59 to Robert Nelson's Deposition and attached hereto as Exhibit 8; Notice of Early Termination for Event of Default dated 11-17-09, Exhibit 60 to Robert Nelson's Deposition and attached hereto as Exhibit 9.

Nelson contacted Berg and Judd Graham in early January 2009 inquiring about pursuing a loan to County 20.  Berg Deposition, Exhibit C, p. 57, ll. 23-25.  At this point, discussion was had concerning interest rates for the contemplated new County 20 loan.  *Id.* at p. 58, ll. 13-19. Berg informed Nelson the current LIBOR rate was 3.3 percent over 30 day LIBOR.  *Id.* at p. 58,

ll. 24-25.  Nelson inquired as to why the interest rate was different than when the Precision loan

was taken out in May of 2008 and it was explained to him that the interest rate environment had

changed from the previous year.  Berg Deposition, August 25, 2010, attached hereto as Exhibit

10, p. 9, ll. 6-9.

In mid-January, Berg, Nelson and Graham again had a conversation.   During this

conversation, the parties again discussed possible terms for a new loan in addition to discussion

of a termination fee for the swap agreement.  *Id.* at p. 16, ll. 4-9; p. 17, ll. 2-21.  Berg received an

e-mail from Nelson in early February stating that he still wanted to pursue the County 20 loan.

*Id.* at p. 20, ll. 16-19; p. 23, ll. 9-17; E-mail from Robert Nelson to Scott Berg, 2-2-09, Exhibit

43 to Scott Berg's Deposition and attached hereto as Exhibit 11.   Berg responded requesting

more information regarding the requested loan, such as collateral for the loan.  Berg Deposition,

Exhibit 10, p. 23, ll. 18-25, p. 24, ll. 1-4; E-mail from Scott Berg to Robert Nelson, 2-5-10,

Exhibit 11.  As late as February 23, 2009, Wells Fargo advised Nelson of rates for a new loan to

County 20 to be paired with the existing Precision/Nelson swap agreement.  E-mail from Scott

Berg to Robert Nelson, 2-23-09, Exhibit 44 to Scott Berg's Deposition and attached hereto as

Exhibit 12.  Nelson never applied for a new loan for County 20 to be paired with the June 2008

swap.  There is no evidence in this case that Nelson had ever been refused a new loan to be

paired with the June 2008 swap.  Nelson did not obtain a new loan because he simply did not

want to pay the interest required to secure the new debt.  Nelson Deposition, Exhibit A, p. 182,

ll. 8-22.

In early February, 2009, Nelson executed an authorization to authorize the swap

payments for the June 2008 swap to be debited from the County 20 account rather than the

Precision Equipment account.   *Id.* at p. 178, ll. 14-24.  This was due to the fact that Precision

Equipment was no longer in business and would not have the funds to make the payments.  *Id.* at p. 178, ll. 24-25; E-mail from Robert Nelson to Scott Berg, 2-5-09, Exhibit 56 to Robert Nelson's Deposition and attached hereto as Exhibit 13.

On October 29, 2009 Wells Fargo sent Nelson a letter notifying him of breach of the swap agreement for nonpayment of the June 2, 2008 Master Agreement.  *Id.* at p. 186, ll. 23-25; p. 187, ll. 1-5; Notice of Failure to Pay, Exhibit 8.  On November 17, 2009, Nelson received a notice of early termination of the June 2, 2008 Master Agreement due to default.  Nelson Deposition, Exhibit A, p. 188, ll. 4-15; Notice of Early Termination for Event of Default, Exhibit 9.  The present action was commenced on November 4, 2009.  Docket #1.


## STATEMENT OF DISPUTED MATERIAL FACTS REQUIRING TRIAL

Local Rule 7.1(A)(2) provides that a memorandum in support of a motion for summary judgment must have a statement of undisputed material facts with support from the record or the motion may be denied.  Plaintiffs do not have a clear section of undisputed material facts.  They have a section titled "Facts" without indication whether they contend the facts are material and undisputed.   Wells Fargo will identify those facts listed in Plaintiffs' "Facts" section which it disputes and indicate why those facts are disputed.  Additionally, Plaintiffs have listed a number of statements within their argument which they contend are uncontradicted.  Those, although not compliant with Rule 7.1(A)(2), will also be addressed here as they are disputed material facts requiring trial.

**DISPUTED FACT #1**: The swap agreement at issue in this matter is that dated November 2007.  ISDA Master Agreement dated 11-8-07, Exhibit G to Plaintiffs' Brief.

- A swap agreement dated June 2, 2008 was entered into between Wells Fargo and Precision Equipment.  ISDA Master Agreement dated 6-2-08, attached hereto as <u>Exhibit 4</u>.

- A Novation Agreement was entered into on September 9, 2008 among Wells Fargo, County 20 and Precision Equipment transferring the rights and obligations from the November 2007 swap agreement with the effect that Wells Fargo and Precision Equipment would enter into a new swap agreement (June 2008) having identical terms as the November 2007 swap agreement.  Novation Agreement, attached hereto as <u>Exhibit 6</u>.

**<u>DISPUTED FACT #2</u>**: "Nelson was reassured that as long as he had debt with Wells Fargo with appropriate collateral, the loan would continue to fruition."  Plaintiffs' Brief, p. 4.

- Staller informed Nelson that in order to exchange the debt under the swap, he would have to have "a note of similar terms, maturity, [and] rate or it would impact what the ultimate rate is on the swap."  Staller Deposition, <u>Exhibit D</u>, p. 84, l. 25; p. 85, ll. 1-3.

- Staller talked to Nelson about "the terms matching the terms of the commitment that [they] had made."  *Id.* at p. 85, ll. 4-11.

**<u>DISPUTED FACT #3</u>**: "Nelson was also informed that as long as he had debt, whether existing, present or future, and Nelson was able to secure loans with collateral, the interest rate would not change and it would continue for 5 years."  Plaintiffs' Brief, p. 4.

- *See* Disputed Fact #2 above.

- Staller testified that there is no guarantee that when a customer exchanges notes under the swap the customer will always receive the original interest rate.  Staller Deposition, <u>Exhibit D</u>, p. 123, ll. 8-14.

- Staller testified that if the customer cannot obtain a note with a similar rate the swap could be used in the future but the rate would be different, either higher or lower. *Id.* at p. 124, ll. 7-17.

**DISPUTED FACT #4**: "Nelson was informed that if he sold the collateral securing the loan, as long as he had sufficient collateral, the parties would substitute collateral and/or parties and the swap would continue."  Plaintiffs' Brief, pp. 4-5.

- *See* Disputed Facts ## 2 & 3 above.

**DISPUTED FACT #5**: "Nelson further understood the portability of a swap agreement was like a name change."  Plaintiffs' Brief, p. 5.

- The portability aspect was discussed in the swap presentation given by Brian Knapp.  *See* Wells Fargo Interest Rate Presentation dated 10-23-07, <u>Exhibit H</u> to Plaintiffs' Brief. The portability benefit states: "If the loan were prepaid, the swap can be used to fix the rate on other floating rate obligations you may have." *Id.*

- In regard to the portability, Brian Knapp testified that, for instance, if some collateral were sold, he could use other floating rate debt either preexisting or new debt.  Knapp Deposition, <u>Exhibit B</u> to Plaintiffs' Brief, p. 62, ll. 20-25; p. 63, ll. 1-5.  However, if it were a new loan, credit approval would be required. *Id.* at p. 63, ll. 6-10.

**DISPUTED  FACT  #6**: "Nelson understood that there was no requirement that a new promissory note would have to be entered between the parties.  In 2008 pursuant to the swap agreement, Wells Fargo allowed the original indebtedness from County 20 to be transferred to Precision Equipment and the transfer went seamless with no problems."  Plaintiffs' Brief, p. 5.

- The original indebtedness of County 20 was not transferred to Precision Equipment.  On or about May 13, 2008, Nelson executed a promissory note on behalf of Precision

Equipment Manufacturing of North America ("Precision Equipment") in the amount of $2,450,000.00. Promissory Note dated 5-13-08, Exhibit J attached to Plaintiffs' Brief.

- In June of 2008, Precision Equipment entered into a new swap agreement. ISDA Master Agreement dated 6-2-08, Exhibit 4.

- In September 2008, Nelson paid off the County 20 loan and the June 2008 swap agreement was paired to the Precision Equipment note. Deposition of Scott Berg ("Berg Deposition"), August 23, 2010, Exhibit C attached to Plaintiffs' Brief, p. 38, ll. 1-4.

- *See* Disputed Fact #1 above.

**DISPUTED FACT #7**: "A new promissory note was executed May 13, 2008 accordingly where the debt was transferred from County 20 to Precision Equipment." Plaintiffs' Brief, p. 6.

- The May 13, 2008 promissory note did not transfer the debt from County 20 to Precision Equipment. The County 20 note was still in force when the Precision Equipment note was signed. Berg Deposition, Exhibit C, p. 39, ll. 12-20.

- *See* Disputed Fact #1 above.

**DISPUTED FACT #8**: "Berg responded that the transaction Nelson was contemplating was agreeable."

- Berg told Nelson that they could look at lending the money, but that an underwriting process would need to be done. Berg Deposition, Exhibit C, p. 43, ll. 23-25; p. 44, l. 1; p. 65, ll. 18-21; p. 66, ll. 11-13.

**DISPUTED FACT #9**: "However, Berg informed Nelson that it would take approximately three weeks to prepare the loan documents." Plaintiffs' Brief, p. 7.

- Nelson had inquired as to how long it would take to accomplish the new County 20 note and Berg told him that to do a new loan it would take six to eight weeks, but since they

12

had an appraisal it would be three to four weeks because they would have to go through the underwriting process. *Id.* at p. 52, ll. 8-11.

**DISPUTED FACT #10**: "They further discussed that the terms and conditions on the new note would be the same as on the existing note under the swap agreement with Precision Equipment." Plaintiffs' Brief, p. 7.

- Berg testified that the swap was not discussed during this conversation. Berg Deposition, Exhibit C, p. 67, ll. 13-23.

- The essential terms of the new County 20 note, such as interest rate and effect on the swap agreement, were not discussed. *Id.* at p. 53, ll. 20-25; p. 54, ll. 1-7.

- Nelson just assumed that the County 20 loan would have the same terms and conditions and did not discuss this with Berg. Nelson Deposition, Exhibit A, p. 150, ll. 11-17.

**DISPUTED FACT #11**: "Nelson informed Berg that he would secure financing from another lender to pay off the Precision Equipment loan." Plaintiffs' Brief, p. 8.

- Prior to January 2009, Berg was not aware that Nelson actually planned to pay off the Precision Equipment by the end of 2008. Berg Deposition, Exhibit C, p. 54, ll. 13-18.

- Berg did not become aware that the Precision Equipment note had been paid off until the first or second week in January 2009. *Id.* at p. 54, ll. 19-25; p. 55, ll. 1-2.

**DISPUTED FACT #12**: "After January 1, 2009, Nelson would execute a replacement promissory note at Wells Fargo with County 20 Storage & Transfer being the new borrower in lieu of Precision Equipment Manufacturing." Plaintiffs' Brief, p. 8.

- *See* Disputed Fact #8 above.

13

- On December 24, 2008, Berg understood that Nelson would be seeking financing from another financial institution for the new County 20 note. *Id.* at p. 64, ll. 18-25; p. 65, ll. 1-4.

**DISPUTED FACT #13**: "Wells Fargo would also receive a mortgage in a previous building Wells Fargo had a lien upon which was recently appraised as having a value in excess of the note in question, $2,450,000.00."  Plaintiffs' Brief, p. 8.

- *See* Disputed Facts ## 8, 12 above.

**DISPUTED FACT #14**: "Based upon Nelson's conversations with Wells Fargo banker, Scott Berg, the parties agreed and understood that by December 31, 2008, Nelson would pay off Precision Equipment's obligation outstanding to Wells Fargo (tied in to the swap agreement), and that by mid-January 2009, Scott Berg would prepare a replacement promissory note in which the substituted borrower would be County 20 Storage."  Plaintiffs' Brief, p. 8.

- *See* Disputed Facts ## 8, 11 above.

- Nelson testified that he assumed that the loan documents would be prepared but it was only an assumption on his part.  Nelson Deposition, <u>Exhibit A</u>, p. 152, ll. 19-25.

**DISPUTED FACT #15**: "The Precision Equipment loan would be transferred to County 20 Storage in the identical amount of the Precision Equipment loan balance outstanding, the overall interest rate would remain the same, 6.1% fixed, tied to the swap agreement and that Wells Fargo would obtain a mortgage upon real estate that it previously held as collateral."  Plaintiffs' Brief, p. 8-9.

- *See* Disputed Fact #10.

**DISPUTED FACT #16**: "Nelson expected the loan documents to be done in two (2) to three (3) weeks – right after the first of the year."  Plaintiffs' Brief, p. 9.

- *See* Disputed Fact #14.

**DISPUTED FACT #17**: "In the second week of January 2009, Nelson contacted Berg and inquired as to the status of the loan documentation."  Plaintiffs' Brief, p. 9.

- Nelson contacted Berg in early January 2009 inquiring about pursuing a loan to County 20.  Berg Deposition, <u>Exhibit C</u>,  p. 57, ll. 23-25.

**DISPUTED FACT #18**: "Nelson agreed to pay the 8.7% - 9.3% interest and agreed to continue his relationship with Wells Fargo.  Wells Fargo never prepared any substituted loan documentation."  Plaintiffs' Brief, p. 9.

- Berg received an e-mail from Nelson in early February stating that he still wanted to pursue the County 20 loan.  Berg Deposition, <u>Exhibit C</u>, at p. 20, ll. 16-19; p. 23, ll. 9-17; E-mail from Robert Nelson to Scott Berg, 2-2-09, attached hereto as <u>Exhibit 11</u>.

- Berg responded requesting more information regarding the requested loan, such as collateral for the loan.  Berg Deposition, <u>Exhibit 10</u>, p. 23, ll. 18-25, p. 24, ll. 1-4; E-mail from Scott Berg to Robert Nelson, 2-5-09, <u>Exhibit 11</u>.

- Berg quoted a rate of 30-day LIBOR plus 4.60% on February 23, 2009.  E-mail from Scott Berg to Robert Nelson, 2-23-09, <u>Exhibit 12</u>.  Nelson did not apply for a loan at that rate.

**DISPUTED FACT #19**: "If the parties' agreement was in fact consummated in January 2009, Wells Fargo Moorhead would receive interest of only 1.78% and Wells Fargo San Francisco would receive the difference between the swap, 6.1% less 1.79% which equals 4.31%." Plaintiffs' Brief, p. 10.

- Plaintiffs failed to provide any citation to the record to support this statement.

**DISPUTED FACT #20**: "With LIBOR in early January at 0.38%, the new mandate issued by Wells Fargo would require the Wells Fargo Moorhead, Minnesota, branch loan to have a fixed rate of 5%." Plaintiffs' Brief, p. 10.

- Plaintiffs failed to provide any citation to the record to support this statement.

**DISPUTED FACT #21**: "Since the swap was at approximately 3.88%, this would result in a fixed interest rate for Bob Nelson of 8.88% to 9.3%." Plaintiffs' Brief, p. 10.

- Plaintiffs failed to provide any citation to the record to support this statement.

**DISPUTED FACT #22**: "This was the rationale for Nelson being informed in mid-January, 2009, that his loan with Wells Fargo would now increase to 8.7% - 9.3%." Plaintiffs' Brief, p. 10.

- Plaintiffs failed to provide any citation to the record to support this statement.
- The citation provided is to Nelson's deposition which does not support such a proposition.

**DISPUTED FACT #23**: "This is the rationale for Wells Fargo breaching the parties' agreement that Nelson could substitute Precision Equipment for County 20 as the new borrower for the same amount of the indebtedness with replacement collateral under the same terms and conditions of the Precision Equipment loan, LIBOR plus 1.4%." Plaintiffs' Brief, p. 10.

- Plaintiffs failed to provide any citation to the record to support this statement.
- The citation provided is to Nelson's deposition which does not support such a proposition.
- Plaintiffs have not alleged breach of contract as a cause of action in this matter. Docket #1.

16

**DISPUTED FACT #24**: "In mid 2009, Dell Arneson also experienced Wells Fargo's decision to no longer honor portability of swap agreements."  Plaintiffs' Brief, p. 11.

- The citation to page 17 of Dell Arneson's deposition does not support this statement.

**DISPUTED FACT #25**: "Berg testified that Berg and Nelson did discuss substituting Precision Equipment as the borrower to County 20, the amount of the debt to be swapped, and fixing the existing swap agreement to the substituted promissory note in County 20's name."  Plaintiffs' Brief, pp. 11-12.

- Berg testified that it would be a new loan for County 20, not a substitution.  Berg Deposition, Exhibit C, p. 43, ll. 3-7.

- An underwriting process would be required for any new note.  *Id.* at p. 52, ll. 13-16.

- Berg testified the swap was not discussed on December 24, 2008.  *Id.* at p. 67, ll. 13-23.

**DISPUTED FACT #26**: "Berg acknowledged that the new promissory note was to run the duration of the existing swap and have the same payment terms."  Plaintiffs' Brief, p. 12.

- This statement is unsupported by the record.  The portion of Berg's deposition cited to, pages 43-44, do not support this statement.  There is no acknowledgment that any new note would run the duration of the existing swap or have the same payment terms.

**DISPUTED FACT #27**: "Staller testified the swap was recommended to Nelson because of portability."  Plaintiffs' Brief, p. 12.

- *See* Disputed Fact #2 above.

- Staller testified that one of the benefits of a swap agreement is portability.  Staller Deposition, Exhibit D, p. 130, ll. 11-15.

**DISPUTED FACT #28**: "Nelson believed that if the promissory note tied to the swap was paid off, he could secure another loan to tie to the swap so long as the bank would have adequate collateral."  Plaintiffs' Brief, p. 12.

- *See* Disputed Facts ## 2 & 5 above.

**DISPUTED FACT #29**: "Nelson would be provided the same rate of interest for the duration of the swap – 5 years."  Plaintiffs' Brief, p. 12.

- *See* Disputed Facts ## 2 & 3 above.

**DISPUTED FACT #30**: "Nelson was induced to enter into an International Swap Dealer Agreement with Wells Fargo because it produced the lowest fixed rate of interest and because of its portability – ability to utilize a swap with other indebtedness."  Plaintiffs' Brief, p. 21.

- Plaintiffs have failed to cite to evidence in the record to support this statement.

- *See* Disputed Facts ## 2, 3 above.

- Nelson was given the opportunity to read the swap agreement documents in 2003, 2007 and 2008 before he signed them, which he does not recall doing in 2003 and he chose not to do in 2007 and 2008.  Nelson Deposition, Exhibit A, p. 71, ll. 1-4; p. 106, ll. 15-21; p. 129, ll. 5-8.

- Nelson testified that he did not have any unanswered questions regarding the swap agreement in 2007 or the swap agreement in 2008, the swap which is the subject of this litigation.  *Id.* at p. 129, ll. 9-11.

**DISPUTED FACT #31**: "That in September 2008, the indebtedness was swapped/transferred to Precision Equipment Manufacturing of North America for the identical indebtedness."  Plaintiffs' Brief, p. 21.

- The indebtedness was not swapped, the rights and obligations of the November 2007 swap agreement was transferred to the June 2008 swap agreement.  Novation Agreement, Exhibit 6.

**DISPUTED FACT #32**: "That Nelson sought to transfer/swap the loan from Precision Equipment back to County 20 in December 2008."  Plaintiffs' Brief, p. 21.

- Nelson sought a new loan for County 20 in December 2008 to pay off the Precision Loan. Berg Deposition, Exhibit C, p. 42, ll. 12-24.

**DISPUTED FACT #33**: "Scott Berg, a commercial banker with less than 11 months experience, agreed that Bob Nelson could transfer the Precision Equipment loan with Wells Fargo Bank back to County 20 Storage & Transfer and that the loan would be secured by a building that Wells Fargo was familiar with and previously utilized as collateral."  Plaintiffs' Brief, p. 21.

- Before becoming a business banker, Berg spent two years as a credit analyst with Wells Fargo.  Berg Deposition, Exhibit C, p. 6, ll. 1-5.

- *See* Disputed Facts ## 8 & 10 above. There was never an agreement to "transfer" loans or an agreement to lend money.

**DISPUTED FACT #34**: "That Scott Berg represented it would take two (2) to three (3) weeks to prepare the loan documentation and he lacked the ability to do so by December 31, 2008." Plaintiffs' Brief, p. 22.

- *See* Disputed Fact #9 above.

**DISPUTED FACT #35**: "That Bob Nelson and Scott Berg agreed to the terms and conditions that Wells Fargo would replace existing Precision Equipment loan by transferring the same to County 20 Storage & Transfer for the identical balance of the loan indebtedness, with the same

terms and conditions, and that the debt would mirror the existing agreement between Wells Fargo and Precision Equipment." Plaintiffs' Brief, p. 22.

- *See* Disputed Facts ## 8 & 10 above.

**DISPUTED FACT #36**: "The parties did not discuss the interest rate, since the parties all knew that the interest rate was 6.1% fixed pursuant to the swap agreement." Plaintiffs' Brief, p. 22.

- *See* Disputed Fact # 10.

**DISPUTED FACT #37**: "Scott Berg is estopped from now asserting the parties failed to agree to all essential terms and conditions – the interest rate." Plaintiffs' Brief, p. 22.

- This is a legal argument, not a fact.

**DISPUTED FACT #38**: "The parties discussed all the essential terms and conditions of the replacement loan and the fact that the loan would be transferred under the same terms and conditions to County 20." Plaintiffs' Brief, p. 22.

- *See* Disputed Fact #10 above.

**DISPUTED FACT #39**: "The parties' previous course of dealing demonstrated that the loan which originated with County 20 was transferred to Precision Equipment seamlessly and that Nelson sought a seamless retransfer back to County 20." Plaintiffs' Brief, p. 22-23.

- This is a legal argument, not a fact.

- *See* Disputed Fact #12 above.

**DISPUTED FACT #40**: "LIBOR had significantly declined from the date of inception, November 2007, at 4.7% to December 2008, at 1.0%." Plaintiffs' Brief, p. 23.

- Plaintiffs have failed to cite to evidence in the record to support this statement.

**DISPUTED FACT #41**: "In December 2008, Wells Fargo locally was receiving interest of LIBOR plus 1.4% or 2.4%.  Under the swap agreement, Wells Fargo nationally was receiving the difference 3.75% (6.1% less 2.4%)."  Plaintiffs' Brief, p. 23.

- Plaintiffs have failed to cite to evidence in the record to support this statement.

**DISPUTED FACT #42**: "Bob Nelson contacted Scott Berg on or about January 14, 2009, to inquire as to the status of the loan documents being prepared to transfer the loan from Precision Equipment to County 20."  Plaintiffs' Brief, p. 23.

- *See* Disputed Fact #17 above.

**DISPUTED FACT #43**: "For the first time ever, Bob Nelson was informed on or about January 16, 2009, that Wells Fargo could no longer honor its swap agreement and fixed rate of interest at 6.1% and that the loan interest rate would not be in excess of 8.7% - 9.3%."  Plaintiffs' Brief, pp. 23-24.

- There is no evidence to support the statement that Wells Fargo would no longer honor the swap agreement.  The June 2008 swap agreement remained in place until termination by Wells Fargo for nonpayment by Nelson in November 2009.  Notice of Early Termination for Event of Default, <u>Exhibit 9</u>.

- *See* Disputed Facts ## 2 & 3 above.

**DISPUTED FACT #44**: "That Nelson reasonably relied upon the representations of Berg in paying off the Precision Equipment loan with a State Bank of Fargo 90 day bridge loan in reliance of replacing the Precision Equipment loan with a loan in the name of County 20 with identical terms and conditions and for the remaining life of the swap agreement."  Plaintiffs' Brief, p. 24.

- *See* Disputed Facts ## 8, 9, 10, 11 above.

**DISPUTED FACT #45**: "Due to Wells Fargo representatives, namely Scott Berg's, representations, statements, actions and inactions, Bob Nelson paid off his existing indebtedness with Wells Fargo with the understanding that similar indebtedness would be procured within two (2) to three (3) weeks in the name of County 20."  Plaintiffs' Brief, p. 24.

- *See* Disputed Facts ## 8, 9, 10, 14 above.

**DISPUTED FACT #46**: "But for Wells Fargo's representations and statements, Bob Nelson would not have paid off his indebtedness at Wells Fargo and would today still have a separate indebtedness under the swap agreement."  Plaintiffs' Brief, p. 25.

- *See* Disputed Facts ## 8, 9, 10, 11 above.


## LAW AND ARGUMENT

The Plaintiffs have made a motion for summary judgment, seeking a determination by this Court that "Nelson has no further obligations under the International Swap Dealer Agreement due to Wells Fargo's actions".  Plaintiffs' Brief, p. 14.  The legal theory proffered by the Plaintiffs is promissory estoppel, as pled in Count 2 of their Complaint.  Docket #1.  Again, the Counterclaim in this case is based upon the June 2008 swap agreement.  *See* Docket #9.  The Plaintiff denied the existence of this agreement in his answer to the counterclaim and has made no reference to it in his brief in support of his motion for summary judgment.  Docket #10.  As a starting point for analysis, the Court and this answering party should have been advised, at a minimum, precisely what instruments the Plaintiffs contend create obligations and rights of the parties.  Nevertheless, there are numerous factual issues precluding summary judgment on the Plaintiffs' claim of promissory estoppel.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is a procedural device to "expeditiously determine cases without necessity for formal trial where there is not substantial issue of fact. . . ." *Kern v. Tri-State Ins. Co.*, 386 F.2d 754, 756 (8th Cir. 1967).  The Eighth Circuit has stated:

> Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.   In considering a motion for summary judgment, the Court is required to view the facts in a light most favorable to the nonmoving party.  Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party.  The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.

*Shelter Ins. Companies v. Hildreth*, 255 F.3d 921, 924 (8th Cir. 2001) (internal citations omitted).

## II.    THERE ARE NUMEROUS QUESTIONS OF FACT WHICH PRECLUDE ENTRY OF SUMMARY JUDGMENT ON THE GROUNDS OF PROMISSORY ESTOPPEL

As a preliminary matter, it is noted that North Dakota Courts generally view estoppel claims with disfavor.   "Estoppel is not favored and the burden of proving each element is on the party asserting it." *Gorley v. Parizek*, 475 N.W.2d 558, 560 (N.D. 1991) (citing *Johnson v. Northwestern Bell Telephone Co.*, 338 N.W.2d 622 (N.D. 1983)).   "Estoppel is generally a question of fact." *Peterson Mechanical, Inc. v. Nereson*, 466 N.W.2d 568, 571 (N.D. 1991) (citing *Gruebele v. Mott Grain Co.*, 262 N.W.2d 747 (N.D. 1978); *Fortman v. Manthey*, 248 N.W.2d 821 (N.D. 1976)).

In order to recover under the doctrine of promissory estoppel, the Plaintiff must establish that there are no questions of material fact and must meet the following four elements, as a matter of law:

23

1) a promise which the promisor should reasonably expect will cause the promisee to change his position; 2) a substantial change of the promisee's position through action, or forebearance; 3) justifiable reliance on the promise; and 4) injustice which can only be avoided by enforcing the promise.

*Russell v. Bank of Kirkwood Plaza*, 386 N.W.2d 892, 896 (N.D. 1986) (citing *O'Connell v. Entertainment Enterprises*, 317 N.W.2d 385, 390 (N.D. 1982)).  Each of these elements will be discussed, in turn.

### 1.     A promise

The first element requires a promise which the promisor should reasonably expect will cause the promisee to change his position.  "The promise must 'be clear, definite, and unambiguous as to essential terms before the doctrine of promissory estoppel may be invoked to enforce an agreement or to award damages for the breach thereof.'"  *University Hotel Development, LLC v. Dusterhoft Oil, Inc*., 2006 ND 121, ¶ 11, 715 N.W.2d 153 (quoting *Lohse v. Atlantic Richfield Co.*, 389 N.W.2d 352, 357 (N.D. 1986)).

Plaintiffs herein argue that on December 24, 2008, Nelson and Berg had a telephone conversation during which the parties agreed to the following:

1. Bob Nelson would pay off the Precision Equipment loan outstanding to Wells Fargo before its close of business December 31, 2008.  (Nelson Depo. pp. 156, 157);
2. That Wells Fargo would prepare new loan documents in 2-3 weeks in which County 20 would be the borrower for the identical amount that Bob Nelson had paid Wells Fargo to pay off the Precision Equipment loan.  (Nelson Depo., pp. 151-152);
3. That Bob Nelson could expect the loan documents to be prepared during the week of January 9, 2009.  (Nelson Depo., pp. 152, 153); and
4. That the County 20 loan would contain the same terms and conditions as the existing Precision Equipment loan including under the swap agreement, a fixed rate of interest 6.1% and the local loan with Wells Fargo being paid at LIBOR plus 1.4%.  (Nelson Depo., pp. 149-151).

Plaintiffs' Brief, p. 27.

While this is clearly the Plaintiffs' theory of the case, these "facts" are disputed.  Berg testified that he had a conversation with Nelson on December 24, 2008 wherein Nelson initially indicated he wanted to pay off the Precision Equipment loan by the end of the year to receive a tax advantage.  Berg Deposition, August 23, 2010, attached as <u>Exhibit C</u> to Plaintiffs' Brief, p. 42, ll. 12-25.  Berg told Nelson that Wells Fargo could not offer a new loan to County 20 prior to the end of the year.  *Id.* at p. 52, ll. 8-16; p. 65, ll. 9-12.  Berg told Nelson that any request for a new loan would require a new credit process and underwriting analysis which would take three to four weeks.  *Id.* at p. 52, ll. 8-16.  Berg specifically recalls telling Nelson this would be new debt.  *Id.* at p. 66, ll. 11-13.  Berg understood from his conversation with Nelson on December 24, 2008 that Nelson did not want to obtain financing for County 20 from Wells Fargo at that time.  *Id.* at p. 64, ll. 23-25; p. 65, ll. 1-4.  Berg did not recall any conversation with Nelson on December 24, 2008 about the swap agreement.  *Id.* at p. 67, ll. 13-23.  Berg did not recall any conversation with Nelson on December 24, 2008 about the term of the contemplated loan or any discussion regarding interest rates or any effect on any fixed rate if the new loan were paired with a swap agreement.  *Id.* at p. 53, ll. 20-25; p. 54, ll. 1-3.   Nelson testified that he only assumed the terms and conditions would be the same as on the Precision Equipment note.  Nelson Deposition, <u>Exhibit A</u>, p. 150, ll. 11-17.  The result of this conversation was that the Wells Fargo loan officer understood that Nelson was unhappy with the described Wells Fargo credit process and was going to be seeking financing elsewhere, if at all.  Berg Deposition, <u>Exhibit C</u>, p. 64, ll. 23-25; p. 65, ll. 1-4.

In order to establish promissory estoppel, the Plaintiffs need to prove as a matter of law that there was a "clear, definite and unambiguous" promise made.  ***See Karch v. Equilon Enterprises, LLC***, 286 F. Supp. 2d, 1075, (D.N.D. 2003) (failure to set forth essential terms of

agreement is a failure to satisfy elements of promissory estoppel); *Lohse*, 389 N.W.2d at 357 (promise was not clear, definite and unambiguous where there was a failure to agree or even discuss essential terms of agreement).   In this case, it is submitted that the evidence of record is overwhelming that while a discussion was had about a possible loan, the parties never discussed any definite terms and, in fact, Wells Fargo understood that Nelson was going to obtain financing elsewhere.   Indeed, it was not until January of 2009 that the parties began to discuss any definite terms of a possible loan to County 20.   Berg Deposition, <u>Exhibit C</u>, p. 58, ll. 13-16. Despite the implied assertions to the contrary, Wells Fargo did not refuse to lend money to County 20 in 2009; the parties simply could not come to agreement as to terms.

Therefore, Plaintiffs have not proven that there was a promise at all, let alone a clear, definite and unambiguous promise.   Thus, the first element of promissory estoppel fails.   At the very least, there are questions of fact regarding the conversation and summary judgment must be denied.

### 2.   Substantial change of position

The second element of promissory estoppel requires a substantial change in position. Plaintiffs claim that absent Wells Fargo's promise to "replace the Precision Equipment note with County 20, Nelson would never have paid in full the Precision Equipment loan."   Plaintiffs' Brief, p. 16.   It is submitted that the sole reason Nelson paid off the Precision note prior to January 1, 2009 was because he could gain a $200,000 tax advantage by winding up the business of Precision by that date.   Nelson Deposition, <u>Exhibit A</u>, p. 163, ll. 20-25.

The testimony of Mark Larson, Nelson's CPA, and Nelson's own testimony indicate that the decision to pay off that note was made by Nelson prior to any conversation with Wells Fargo on December 24, 2008.   Larson testified that Precision Equipment was not a profitable business.

26

Larson Deposition, Exhibit 1, p. 16, ll. 24-25; p. 17, ll. 1-3.   The decision was then made to wind-up Precision Equipment at the end of November or December of 2008 in order to receive the $200,000 tax advantage from the Precision Equipment losses.  *Id.* at p. 18, ll. 23-25; p. 19, ll. 1-23.  Larson advised Nelson that he needed to pay off the Precision Equipment note at Wells Fargo before the end of 2008 to reap the tax advantages.  *Id.* at p. 20, ll. 20-22.

Nelson did not substantially change his position as a result of any representations or actions by Wells Fargo.  The testimony shows that Nelson had already made the decision, upon the advice of his CPA, Mark Larson, to wind-up Precision Equipment and pay off the note in order to take advantage of a $200,000 tax deduction.  *Id.* at p. 18, ll. 23-25; p. 19, ll. 1-23. Therefore, because Nelson did not substantially change his position based upon any actions or representations made by Wells Fargo, the second element of promissory estoppel fails.  *See Russell*, 386 N.W.2d at 896 (where plaintiff failed to establish that he changed his position by obtaining a loan as a result of the defendant's loan commitment requirement, but would have obtained a loan regardless, he failed to satisfy the second element of promissory estoppel).  At the very least, it is a question of fact whether Nelson paid off the Precision Equipment loan based upon any representations or actions of Wells Fargo and summary judgment must be denied.

### 3.       Justifiable reliance

The third element of promissory estoppel requires justifiable reliance on the promise. Assuming, arguendo, that some type of definite promise was made by Wells Fargo, Plaintiffs failed to satisfy this element as a matter of law.

The relationship between the parties was contractual.  There existed a promissory note from Precision/Nelson to Wells Fargo dated May 2008.  There also existed a swap agreement dated June 2008, along with numerous other attendant contracts above referenced.  Promissory

Note, 5-23-08, <u>Exhibit J</u>.  Each of these contracts set forth numerous obligations of the parties.
For example, the June 2008 swap agreement itself provides that a transfer of obligations could
not occur without the prior written authorization of Wells Fargo.  ISDA Master Agreement,
<u>Exhibit 4</u>, p. 11. Nelson was described by his own accountant as being sophisticated in matters of
finance and credit.  Larson Deposition, <u>Exhibit 1</u>, p. 23, ll. 23-25; p. 24, ll. 1-3.  Indeed, he had
entered into three separate swap agreements and had sat through two separate presentations from
Wells Fargo on swap agreements.  His former banker, Dan Staller, had explained to him that new
debt may well affect the fixed rate when paired with a swap agreement.  Staller Deposition,
<u>Exhibit D</u>, p. 84, l. 25; p. 85, ll. 1-11.  Nelson should have been well aware that these contractual
agreements imposed upon him obligations to which he would be bound.

Further, Nelson believed at the time that Berg was not as experienced as Nelson in terms
of banking.  Nelson referred to Berg as "green", "very young", and "learning the ropes" during
the time the Berg served as Nelson's banker. Nelson Deposition, <u>Exhibit A</u>, p. 146, ll. 24-25; p.
147, ll. 1-23. Nelson had concerns about Berg's experience level.  *Id.* at p. 147, ll. 14-23.  In fact,
Nelson joked that he was training Berg to be a banker.  *Id.* at p. 147, ll. 1-3.    It is submitted that
it was simply not justifiable for an experienced businessman who was sophisticated in ways of
credit and finance, including swap agreements, to substantially alter his position in reliance upon
a brief conversation with a young banker he simply did not respect.  The Plaintiffs' have not
established justifiable reliance and the third element of promissory estoppel fails.  At the very
least, it is a question of fact whether Nelson justifiably relied upon any representations made by
Wells Fargo and summary judgment must be denied.

4.      **Injustice**

The fourth element which the Plaintiffs must establish as a matter of law is that there was some injustice that can only be avoided by enforcing a promise.  Again, it is submitted that there is no evidence of any definite promise made by Wells Fargo to loan money to County 20.  There was simply a discussion which resulted in both parties understanding that there would be no loan under the terms Nelson was seeking, i.e. a loan prior to January 1, 2009.  Based upon the testimony of Berg and Nelson, it is evident that they have differing recollections of their conversation of December 24, 2008, and as such, there are numerous questions of fact which preclude entry of summary judgment.  Regardless, even if there were a promise to lend money, there is no evidence of injustice.

While the parties did not discuss definite terms on December 24, 2008, they did have subsequent discussions of definite terms of new debt.  On February 2, 2009, Nelson sent an email to Scott Berg which stated in relevant part:

> "Do you have the ability to put a loan in place to mirror the swap loan?  I know that you can not match the old rate but you mentioned a 3.3 over labor or can you give a straight variable loan for a term.  You have all the documents for a loan and if you can't I would need for you to forward the documents to me so I can pursue another loan.  I am gambling that Libor will go up and if it doesn't I would have a 8.1 rate for a term.  Let me know as I will have to pursue the loan and also I need the swap transferred to County 20 Storage and Transfer as soon as possible as Precision Equipment is not keeping an account open."

E-mail from Nelson to Berg, 2-2-09, Exhibit 11.

Clearly, Nelson did not claim on February 2, 2009 any injustice resulting from any alleged promise made by Berg on December 24, 2008.  Nelson acknowledged that the old rate could not be matched for the new debt.  Nelson was agreeable at this time to pay interest in excess of that paid under the old debt.  Berg responded by email dated February 5 inquiring as to the amount sought to be borrowed and the collateral.  E-mail from Berg to Nelson, 2-5-09,

29

Exhibit 11.  Berg also forwarded to Nelson a DDA Authorization which would allow Nelson's payments under the swap agreement to be debited from County 20's checking account which Nelson signed.  Nelson Deposition, Exhibit A, p. 178, ll. 20-25; E-mail from Berg to Nelson, 2-5-09, Exhibit 13.  Ultimately, Scott Berg proposed an interest rate to Nelson for new debt that Nelson did not find agreeable.  E-mail from Berg to Nelson, 2-23-09, Exhibit 12.  Again, Wells Fargo did not refuse to loan money to Nelson; the parties simply never came to agreement as to the terms.

Further, the relation between any alleged injustice and the claimed remedy sought is entirely unclear.  While the Precision note was satisfied by Nelson on December 31, 2008, the June 2008 swap agreement was unaffected by the note payoff.  The Plaintiffs claim in this case that they are entitled to a return of the following money which was debited from Nelson entity accounts:   $8,867.07 on 2/2/09 from Precision Equipment's Acct.; $7,966.79 on 3/2/09 from County 20's Acct.; $8,388.41 on 4/1/09 from County 20's Acct.; and $8,363.22 on 5/1/09 from County 20's Acct.  Docket #1, ¶ 23.  These amounts represented payments due Wells Fargo under the June 2008 swap agreement and were respectively debited on the dates identified from the accounts of Precision and County 20 with the full permission of Nelson.  Third Party DDA, 8-21-08, Exhibit 7; Nelson Deposition, Exhibit A, p. 178, ll. 21-25.

Nelson refused to make further payments on the swap agreement commencing on June 1, 2009.  Notice of Failure to Pay, 10-29-09, Exhibit 8. That swap agreement remained in place until November 2009 at which time it was terminated by Wells Fargo for failure to make payments.  Notice of Early Termination, Exhibit 9.  The termination fee has been calculated by Wells Fargo to be $217,000.  Docket #9.  No alternative calculation of the termination fee has been offered by Nelson.  Nelson could have, at any time between December 31, 2008 and

November 2009, paired the June 2008 swap agreement with new debt to replace the debt previously paired with that swap which was paid off on December 31, 2008. Wells Fargo did not refuse to lend new money to Nelson. Wells Fargo was proposing terms as late as February 2009. Nelson refused to borrow new money from Wells Fargo (or apparently any other source) to pair it with the June 2008 swap. Nelson cannot now claim injustice in the amount he owed under the swap when he refused to perform his obligations under the swap and refused to obtain new debt to be paired with the swap to received full benefits there under. Therefore, the final element of promissory estoppel fails. At the very least, there is a question of fact and summary judgment must be denied.

## III.   THE DOCTRINE OF EQUITABLE ESTOPPEL DOES NOT PROVIDE GROUNDS FOR AFFIRMATIVE RELIEF FOR THE PLAINTIFFS

Interspersed in the Plaintiff's discussion of promissory estoppel are references to the distinct doctrine of equitable estoppel. Equitable estoppel is not a cause of action and has not been so pled in this case. It is a doctrine used to prevent parties from denying or falsifying evidence in a case if certain elements are met. Although not entirely clear from the Plaintiffs' brief, it appears as though the Plaintiff is asserting that the same alleged facts which support his claim for promissory estoppel also support his claim that equitable estoppel is applicable. More specifically, the equitable estoppel claim is premised virtually entirely on Nelson's version of the December 24 conversation with Scott Berg and the errant assumptions Nelson made regarding that conversation.

In essence, Nelson is arguing that Berg's recollection is untrue (apparently because it differs from Nelson's) and therefore Wells Fargo should be stopped from introducing evidence of Berg's recollection of that conversation. Such argument is circular and nonsensical. Space

limitations prohibit the reiteration of every disputed material fact pertaining to the December 24th conversation and precedent and subsequent events, but each disputed material fact noted previously equally applies to the analysis of the equitable estoppel claim.

Equitable estoppel is codified at N.D.C.C. § 31-11-06.  The elements of equitable estoppel are:

1. conduct which amounts to a false representation or concealment of material facts, or at least, which is calculated to convey the impression that the facts are otherwise than those which the party subsequently attempts to assert;
2. the intention, or at least the expectation, that such conduct will be acted upon by, or will influence, the other party or persons; and
3. knowledge, actual or constructive, of the real facts.

Proof of fraud, positive misrepresentation, or unconscionable conduct akin to fraud are necessary to invoke equitable estoppel.  In addition, the party claiming the estoppel must show:

1. lack of knowledge and of the means of knowledge of the truth as to the facts in question;
2. reliance, in good faith, upon the conduct or statements of the party to be estopped; and
3. action or inaction based thereon, of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

"The purpose of equitable estoppel is to preserve rights already acquired and not to create new ones; equitable estoppel does not itself give rise to a cause of action."

*Karch v. Equilon Enterprises, LLC*, 286 F. Supp. 2d 1075, 1078 (D.N.D. 2003) (internal citations omitted).

In order to invoke equitable estoppel, the Plaintiffs must prove fraud, positive misrepresentation, or unconscionable conduct akin to fraud.  The Plaintiffs have asserted fraud and misrepresentation as causes of action in the Amended Complaint but have not moved for summary judgment on such causes, presumably in recognition of the numerous questions of fact

surrounding such claims.  It is submitted that there is no evidence of fraud or conduct akin to fraud in this case.  The parties had a discussion on December 24, 2008 about a possible loan to County 20 to payoff the Precision note.  The parties did not discuss specific terms of the loan. Nelson was not content to follow the underwriting process Wells Fargo required.  Without informing his business bankers at Wells Fargo, Nelson borrowed money from another bank and paid off the Precision note by December 31, 2008 in order to obtain a $200,000 tax advantage. Nelson was a sophisticated business man looking to obtain a significant tax advantage by paying off the Precision note by December 31, 2008.  While he had every right to do so, it is difficult to find any evidence of fraud, or conduct akin, on the part of Wells Fargo.  At a minimum, the parties differing recollections of this conversation creates a question of fact which would preclude a finding by this Court, as a matter of law, that the doctrine of equitable estoppel is applicable.

IV.    THE STATUE OF FRAUDS IS APPLICABLE TO THIS CASE

In its Amended Answer and Counterclaim, Wells Fargo asserted as a defense that claims of alleged oral assertions, representations and promises should be considered invalid under Section 9-06-04, N.D.C.C.  Docket #9.  Nelson asserts in his brief in support of his motion for summary judgment that the statute of frauds is inapplicable to the alleged oral promise of Wells Fargo to transfer the indebtedness under the swap agreement from Precision Equipment to County 20.  Initially, it is noted that the Plaintiff has not alleged in its Amended Complaint, an oral contract, nor has it brought a cause of action for breach thereof.  Docket #1.  The Plaintiff does use the phrase "oral agreement" in its brief to refer to the alleged promises made during the December 24 conversation between Nelson and Berg.  To the extent the Plaintiff is now claiming

some enforceable oral contract, it is parenthetically noted that "[t]he existence of an oral contract is a question of fact." **Johnson Farms v. McEnroe**, 1997 ND 179, ¶ 20, 568 N.W.2d 920.  Since the disputed facts surrounding the existence of the alleged oral contract are numerous, as outlined previously, the existence of such a contract is not a question of law and thus summary judgment cannot be granted.

> North Dakota's statute of frauds identifies contracts which are invalid unless in writing:
>
> The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by the party's agent:
> …
> 4. An agreement or promise for the lending of money or the extension of credit in an aggregate amount of twenty-five thousand dollars or greater.
>
> 5. An agreement or promise to alter the terms of repayment or forgiveness of a debt that is in an aggregate amount of twenty-five thousand dollars or greater.

N.D.C.C. § 9-06-04(4-5).

The alleged oral agreement between Wells Fargo and Nelson, i.e. that the indebtedness from Precision Equipment would be transferred to County 20 pursuant to identical terms and conditions and that the building previously subject to a Wells Fargo mortgage would be used as collateral, falls squarely within North Dakota's statute of frauds.  Although it is disputed that there was, in fact, any such agreement, the agreement alleged by Nelson was to lend County 20 an amount of more than twenty-five thousand dollars, which falls under N.D.C.C. § 9-06-04(4). In addition, the alleged agreement would alter the terms of repayment of Precision Equipment's debt that was in an amount over twenty-five thousand dollars, to which N.D.C.C. § 9-06-04(5) would apply.  Therefore, the statute of frauds applies to any alleged oral agreement and such agreement was required to be in writing in writing in order to be enforceable.

Nelson argues that his partial performance of the alleged agreement takes it out of the statute of frauds.  More specifically, Nelson contends that:

> substantial performance included paying off the Precision Equipment loan outstanding to Wells Fargo with a 90 day bridge loan acquired from State Bank of Fargo, and patiently waiting for Wells Fargo to prepare loan documents over a period of 2 to 3 weeks replacing County 20 as the borrower and replacing the collateral with a County 20 preexisting and fully constructed building.

Plaintiffs' Brief, p. 31.

In *Anheluk v. Ohlsen*, 390 F.Supp.2d 865, 868-69 (D.N.D. 2005), the court analyzed North Dakota's statute of frauds law in the context of alleged lender promises to loan money. The court determined that the North Dakota statute of frauds, requiring an agreement to lend an amount of twenty-five thousand dollars or greater to be in writing, applied since the alleged oral promise by the bank to lend money was in an amount greater than twenty-five thousand dollars. *Id.* (citing N.D.C.C. § 9-06-04(4)).  It further found that the plaintiff could not have prevailed on a breach of contract claim against the lender because the alleged oral promise to make the loan was "barred by the statute of frauds" and there was no written promise to make a loan.  *Id.*

The court acknowledged that "part performance of an oral contract may remove the agreement from the statute of frauds."  *Id.* at 872 (citing *Poyzer v. Amenia Seed & Grain Co.*, 409 N.W.2d 107, 111 (N.D. 1987)).  "However, the partial performance *must be consistent with the existence of a valid oral agreement*."  *Id.* (emphasis added).  The court acknowledged that the record reflected that the plaintiff moved his banking business to the subject bank "based on the optimistic and encouraging statements" of the lender; however, those statements were insufficient to establish "a definite, unconditional oral promise to loan money."  *Id.* at 868, 872.

The same reasoning applied in *Anheluk* applies to this case.  Nelson argues that he partially performed under the alleged oral contract by paying off the Precision Equipment loan

with a bridge loan from State Bank & Trust.  Plaintiff's Brief p. 31.  However, that fact is not consistent only with the existence of the alleged contract between Wells Fargo and Nelson.  It is wholly consistent with Nelson's plan to "offset tax losses of Precision Equipment against the tax gains that Nelson was receiving from the sale of the County 20 building." Plaintiff's Brief, p. 7. As previously noted, Nelson paid off the Precision debt to obtain a $200,000 tax benefit. Therefore, Nelson's claimed partial performance could not take the alleged oral agreement out of the statute of frauds because Nelson's performance is not solely consistent with the existence of the alleged oral agreement between himself and Wells Fargo.

As a part of his analysis regarding partial performance and the statute of frauds, Nelson also asserts that "[p]ursuant to the parties previous *course of dealings*, Nelson requested loans be transferred from one entity to another entity and Wells Fargo agreed premised upon having sufficient collateral and/or a guarantor."  Plaintiff's Brief, p. 31 (emphasis added).  However, course of dealings cannot be used to alter the written terms of the agreement and objection is herein made to consideration of any course of dealing evidence in this case.  "[A]lthough course of dealing may give particular meaning to, supplement, or qualify the terms of an agreement, it may not be used to contradict unambiguous terms of a written agreement." ***First State Bank of Goodrich v. Oster***, 500 N.W.2d 593, 596 (N.D. 1993).  "[W]hen course of dealing would bring about an unreasonable construction of the express terms of the written agreement, the express terms control over course of dealing." ***Id.***

The unambiguous text of the June 2, 2008 Master Agreement between Wells Fargo Bank and County Storage and Transfer, Inc., states:

> 7. Subject to Section 6(b)(ii), ***neither this Agreement nor any interest or obligation in or under this Agreement may be transferred*** (whether by way of security or otherwise) by either party ***without the prior written consent of the other party***, except that:-

36

>     (a)      a party may make such a transfer of this Agreement pursuant to a
>     consolidation or amalgamation with, or merger with or into, or transfer of
>     all or substantially all its assets to, another entity (but without prejudice to
>     any other right or remedy under this Agreement; and
>
>     (b) a party may make such a transfer of all or any part of its interest in any
>     amount payable to it from Defaulting Party under Section 6(e).

***Any purported transfer that is not in compliance with this Section will be Void.***

ISDA Master Agreement, <u>Exhibit 4</u>, p. 11 (emphasis added).  That section clearly requires any transfers of interest or obligation under the swap agreement to be agreed upon in writing.  The exceptions are inapplicable as there was no merger and neither party was a "defaulting party" at the time.  Therefore, Wells Fargo's written consent to allow Precision Equipment to transfer its interest in the agreement to County 20 was required by the swap agreement.  Whatever past course of dealings Nelson now argues existed between the parties cannot conflict with the express requirement that the consent of the other party be in writing prior to any transfer.

The statute of frauds applies to the alleged oral agreement between Nelson and Wells Fargo.  In addition, the existence of an oral agreement is a question of fact, making summary judgment inappropriate.  Moreover, Nelson cannot use course of dealings as evidence of an oral agreement which contradicts the express terms of the written agreement, which express terms require any transfers to be approved by written consent of the other party.

## V.   DELL ARNESON'S TESTIMONY IS INADMISSIBLE TO PROVE WELLS FARGO'S ROUTINE PRACTICE

Finally, the Plaintiffs claim that "Wells Fargo's habit and/or routine practices also establish that plaintiff is entitled to summary judgment.  Plaintiffs' Brief, p. 33.  Specifically, the Plaintiffs claim that another Wells Fargo customer, Dell Arneson, had similar experiences with a

Wells Fargo swap agreement as is alleged by Nelson.  Assuming, arguendo, this were true, the Plaintiff fails in all respects to provide analysis as to why such evidence would require this Court to overlook the scores of disputed facts to grant the Plaintiff's motion for summary judgment.

Arneson's deposition testimony as to his relationship with Wells Fargo was objected to as not relevant to the instant matter.  Deposition of Dell Arneson, <u>Exhibit E</u> to Plaintiffs' Brief, p. 5, ll. 24-25; p. 6, ll. 1-10.  Arneson is a friend of Nelson's.  *Id.* at p. 44, ll. 7-8.  Arneson testified he had no personal knowledge of Nelson's relationship with Wells Fargo or any agreement between Nelson and Wells Fargo or of any conversations between Nelson and Wells Fargo. *Id.* at p. 44, ll. 3-6; p. 49, ll. 4-16.  It is anticipated that Wells Fargo will be bringing a separate motion in the near future to exclude Arneson's testimony for all purposes in this action and objection is made herein to consideration of his testimony for the purposes offered.

Rule 406 of the Federal Rules of Evidence provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

"[H]abit or pattern of conduct is never to be lightly established, and evidence of example, for purpose of establishing such habit, is to be carefully scrutinized before admission." ***Loughan v. Firestone Tire & Rubber Co.***, 749 F.2d 1519, 1524 (11th Cir. 1985) (quoting ***Wilson v. Volkswagen of America, Inc.***, 561 F.2d 494, 511 (4th Cir. 1977)).

> Generally, evidence of routine practice must meet three requirements: (1) the evidence "should be of such a nature that it is unlikely that the individual instance can be recalled or the person who performed it can be located," (2) the evidence "must be specific conduct that is engaged in frequently by the group," and (3) the number of instances of such behavior must be large enough that doubt about a single instance does not destroy the inference that the practice existed."

*Westport Ins. v. Ray Quinney & Nebeker*, 2010 WL 2521460, *2 (D. Utah), slip copy (quoting 23 Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure* § 5274 at 45-48 (1980)).  "It is only when examples offered to establish such pattern of conduct or habit are "numerous enough to base an inference of systematic conduct, that examples are admissible." *Loughlan*, 749 F.2d at 1524 (citing *Wilson*, 561 F.2d at 511 (quoting *Straus v. Douglas Aircraft Co.*, 404 F.2d 1152, 1158 (2d Cir. 1968)).  "The key criteria are 'adequacy of sampling and uniformity of responses or ratio of reactions to situations.'"  *Id.* (quoting Advisory Notes, Rule 406, FRE).

> Evidence of the defendant's actions on only a few occasions or only in relation to the plaintiff are not enough; the plaintiff must show regularity over substantially all occasions or with substantially all occasions or with substantially all other parties with whom the defendant has had similar business transactions.

*Mobil Exploration and Producing U.S., Inc. v. Cajun Construction Services, Inc.*, 45 F.3d 96, 99-100 (5th Cir. 1995).

Plaintiffs have not met their burden of establishing either the need for any sort of routine or habit evidence or that Arneson's alleged swap experience would qualify.  First, the transactions of Nelson can be fully recalled and the persons who performed them have been located and deposed.  There is no need to offer Arneson's testimony regarding his experience to somehow explain or qualify Nelson's experience.

 Second, the motion for summary judgment is based upon the claim of promissory estoppel, and not on any other Counts in the Amended complaint.  The alleged promise sought to be enforced was a specific, particular alleged oral representation by Berg on December 24 that the Precision debt and swap obligations would be transferred to County 20.  There is no evidence that the particular type of promise alleged in the pending motion was ever made to Arneson.

Third, the number of instances presented is not numerous enough that doubt about a single instance will not destroy the inference that the practice existed. The only instances presented are the Nelson's and Arneson's. In order to qualify as a habit or routine, the Plaintiffs must show regularity over substantially all occasions or with substantially all occasions or with substantially all other parties with whom the defendant has had similar business transactions. The Plaintiff in this case has alleged similar conduct in a single other case. Such a showing is insufficient to establish habit or routine and the evidence must be excluded from consideration of the instant matter.

## CONCLUSION

Based on the foregoing law and argument, Defendant Wells Fargo Bank, NA respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment in its entirety. Wells Fargo also requests an award of costs and disbursements allowed by law and for any such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 22nd day of November, 2010.

/s/ Scott J. Landa_____
**SCOTT J. LANDA,** (ND ID #04808)
scottlanda@northdakotalaw.net
**JOHN S. FOSTER,** (ND ID #03300)
johnfoster@northdakotalaw.net
Zimney Foster P.C.
3100 S. Columbia Road, Ste 200
P.O. Box 13417
Grand Forks, ND 58208-3417
Phone:701.772.8111 Fax: 701-772-7328
ATTORNEYS FOR DEFENDANT