**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| County 20 Storage & Transfer Inc. and | ) | **ORDER DENYING PLAINTIFFS'** |
| Robert L. Nelson, as successor in interest | ) | **MOTION FOR SUMMARY** |
| to Successor Precision Equipment | ) | **JUDGMENT AND DENYING** |
| Manufacturing of North America, Inc., | ) | **DEFENDANT'S MOTION TO STRIKE** |
| | ) | **DEMAND FOR JURY TRIAL** |
| Plaintiffs/Counter Defendants, | ) | |
| | ) | |
| vs. | ) | Case No. 3:09-cv-104 |
| | ) | |
| Wells Fargo Bank, NA, | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |

_____

Before the Court is the Plaintiffs' motion for summary judgment filed on October 29, 2010.

See Docket No. 29.  The Defendant filed a response in opposition to the motion on November 22,

2010.  See Docket No. 33.  On December 6, 2010, the Plaintiffs filed a reply brief.  See Docket No.

38.  Also before the Court is the Defendant's "Motion to Strike Demand for Jury Trial" filed on

April 15, 2010.  See Docket No. 18.  The Plaintiffs filed a response in opposition to the motion to

strike on April 30, 2010.  See Docket No. 24.  On May 6, 2010, the Defendant filed a reply brief.

See Docket No. 25.  Oral argument on all motions was heard on February 25, 2011 in Fargo, North

Dakota.  For the reasons set forth below, the Court denies the motions.  Trial is scheduled to

commence on May 10, 2011 in Fargo, North Dakota.


I.      **BACKGROUND**

This dispute grows out of a complex financing arrangement between the Plaintiffs and the

Defendant.  Plaintiff County 20 Storage & Transfer Inc. ("County 20") is a North Dakota

corporation with its principal place of business located in Cass County, North Dakota.  Plaintiff

Robert L. Nelson is the owner of County 20, and also owned Precision Equipment Manufacturing of North America, Inc. ("Precision Equipment"), another corporate entity, while it was in business. The defendant, Wells Fargo Bank, NA ("Wells Fargo"), is a national banking association with its main office in Sioux Falls, South Dakota.

Since approximately 1988, Nelson has been involved in numerous banking transactions with, and has borrowed millions of dollars from, Wells Fargo. In 2007, Nelson approached Daniel Staller, a business banking manager with Wells Fargo at the time, regarding financing Nelson's construction of a new building owned by County 20. Staller described two different financial products to Nelson: (1) a typical/conventional promissory note secured by a mortgage against the warehouse building with interest at 6.4%; and (2) a "swap agreement" with a fixed rate of interest at 6.1%. In order to obtain the 6.1% interest rate, Staller informed Nelson that he would have to enter into an International Swap Dealers Association ("ISDA") Master Agreement.[1]

Wells Fargo describes a swap agreement as follows:

> 2.      An Interest Rate Swap Contract[2] between a bank and its customer obligates the loan customer to limit or manage exposure to fluctuations in interest rates, and, if executed contemporaneously with a loan, to achieve the economic effect of paying a fixed rate of interest at a marginally lower interest rate than the customer would have been able to obtain in the absence of an interest rate swap transaction. An Interest Rate Swap Contract is an independent contract separate and distinct from the actual loan contract between the parties.

> 3.      In the Interest Rate Swap Contract [at issue here], the customer pays the bank a fixed rate multiplied by the notional amount of the interest rate swap transaction, and the bank, in turn, pays to the customer a variable rate multiplied by the same notional amount of the interest rate swap transaction. Rather than the

---

[1] Nelson previously entered into an interest rate swap agreement with Wells Fargo in 2003 on behalf of County 20. That swap agreement went through fruition. See Docket No. 30-1, p. 21.

[2] Wells Fargo contends the ISDA Master Agreement, "together with a Schedule, Hedging Authority Resolution, and later but related a Novation Agreement, Third Party DDA Authorization and Confirmation" make up the "Interest Rate Swap Contract." See Docket No. 9, p. 8.

> parties to the interest rate swap transaction exchanging fungible assets, the Interest Rate Swap Contract provides that the party that owes the greater amount pay the difference between the two computed amounts as each installment is paid.  The interest rate swap transaction is therefore an asset for the party who receives net payments and is a liability for the party who owes net payments.

See Docket No. 9, pp. 8-9.

Nelson, on behalf of County 20, entered into an ISDA Master Agreement with Wells Fargo, dated November 8, 2007.  See Docket No. 30-7.  On February 1, 2008, the First Amended and Restated ISDA Confirmation became effective, which states the initial notional[3] amount as $2.45 million.  See Docket No. 30-7, p. 29.  The collateral used was a warehouse building owned by County 20.  On April 8, 2008, Nelson, on behalf of County 20, entered into a promissory note with Wells Fargo in the amount of $2.45 million with a variable interest rate of 1.3 percentage points over LIBOR[4].  See Docket No. 30-9.  The swap agreement was tied to the County 20 promissory note.

After the loan proceeds were advanced, Nelson requested that Wells Fargo substitute the borrower from County 20 to Precision Equipment.  Nelson requested the substitution of a borrower and collateral so that Nelson could sell the original collateral, the County 20 warehouse building, at a profit.  On May 13, 2008, a new promissory note was executed where the debt was transferred from County 20 to Precision Equipment.  See Docket No. 30-10.  Nelson agreed to be a co-borrower.  In June 2008, Nelson and Precision Equipment entered into an International Swap Dealer Agreement with Wells Fargo.  See Docket No. 2-1.  In September 2008, County 20's swap agreement was transferred to Nelson and Precision Equipment.  See Docket No. 9-4.  On September

---

[3] The term "notional" is referenced in several of the ISDA documents but never clearly defined.  The Court is under the assumption that a "notional" amount is a fictional amount used in a swap agreement, which is typically the same total amount of the paired promissory note.

[4] "LIBOR" stands for London Interbank Offered Rate.

11, 2008, Wells Fargo sent Nelson and Precision Equipment a confirmation letter which states in part, "The terms and the provisions of this confirmation supersede and replace those of the original transaction." See Docket No. 9-6.

Nelson then sold the County 20 warehouse which resulted in a large taxable gain for Nelson. Precision Equipment had suffered losses over the last few years, so Nelson decided to dissolve Precision Equipment to take the tax losses.  This would allow Nelson to offset Precision Equipment's tax losses against the tax gains Nelson was receiving from the County 20 building sale. The offset was approximately $200,000.

In December 2008, Nelson approached Scott Berg, Nelson's new business banker at Wells Fargo, since Daniel Staller had left Wells Fargo in March 2008 to join Starion Bank.  Nelson claims he told Scott Berg in December 2008 that he desired to re-transfer the note from Precision Equipment back to County 20.  Berg told Nelson that Wells Fargo could not complete the loan documents before the end of the year.  On December 31, 2008, Nelson obtained a 90-day unsecured bridge loan from State Bank of Fargo to pay off Precision Equipment's note outstanding at Wells Fargo.  Wells Fargo contends that the swap agreement requires that monthly payments continue notwithstanding prepayment of the loan in full.

In the second week of January 2009, Nelson contacted Berg.  Berg told Nelson that the economic environment had resulted in new lending requirements at Wells Fargo and that Wells Fargo could not enter into a new note with County 20 at the same interest rate.  Nelson contends that he agreed to pay the higher interest rate, but that Wells Fargo did not prepare the loan documentation.  Eventually Nelson stopped making payments under the swap agreement.

This action was commenced in state court in November 2009.  The amended complaint contains six causes of action:  (1) negligent misrepresentation; (2) detrimental reliance/promissory estoppel; (3) unjust enrichment; (4) fraud, deceit, misrepresentation; (5) declaratory judgment; and (6) reformation/modification of loan documents.  See Docket No. 1-1.  On November 25, 2009, Wells Fargo removed the action to federal district court.  See Docket No. 1.  Wells Fargo's amended counterclaim seeks a judgment against Precision Equipment and Nelson, jointly and severally, for the value of the alleged past due swap payments and early termination fee.  See Docket No. 9.

## II.    LEGAL DISCUSSION

### A.    SUMMARY JUDGMENT

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to the factfinder or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-

moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

In the brief in support of their motion for summary judgment, the Plaintiffs contend: (1) they should be granted summary judgment based on the doctrines of promissory and equitable estoppel; (2) the statute of frauds is inapplicable; and (3) Wells Fargo's habit and/or routine practices establish that the Plaintiffs are entitled to summary judgment. Wells Fargo contends: (1) there are numerous questions of fact that preclude summary judgment on the grounds of promissory estoppel; (2) the doctrine of equitable estoppel does not provide grounds for affirmative relief for the Plaintiffs; (3) the statute of frauds is applicable; and (4) Dell Arneson's testimony is inadmissible to prove Wells Fargo's routine practice. The parties agree that the substantive law of North Dakota applies.


### 1)     PROMISSORY ESTOPPEL

In order to invoke the doctrine of promissory estoppel, the following four elements must be established: "1) a promise which the promisor should reasonably expect will cause the promisee to change his position; 2) a substantial change of the promisee's position through action, or forbearance; 3) justifiable reliance on the promise; and 4) injustice which can only be avoided by enforcing the promise." Univ. Hotel Dev., L.L.C. v. Dusterhoft Oil, Inc., 2006 ND 121, ¶ 11, 715 N.W.2d 153 (quoting Russell v. Bank of Kirkwood Plaza, 386 N.W.2d 892, 896 (N.D. 1986)).


### a)     PROMISE

The terms of the promise, under the doctrine of promissory estoppel, must be clear, definite, and unambiguous. Univ. Hotel Dev., 2006 ND 121, ¶ 14, 715 N.W.2d 153 (citing Lohse v. Atl.

Richfield Co., 389 N.W.2d 352, 357 (N.D. 1986)).  "Unsupported conclusory allegations are insufficient to withstand summary judgment."  Id. (citing Dalan v. Paracelsus Healthcare Corp. of N.D., Inc., 2002 ND 46, ¶ 7, 640 N.W.2d 726).

The Plaintiffs contend that in December 2008, Scott Berg of Wells Fargo represented and warranted to Nelson that Wells Fargo would enter into a replacement promissory note transaction with Nelson in which County 20 would be the replacement borrower, Nelson would then pay off Precision Equipment's outstanding debt, and the collateral for the loan would be a previously constructed building in which Wells Fargo had a mortgage and had a value in excess of the indebtedness outstanding to Wells Fargo.  While the parties did not discuss the interest rate, the Plaintiffs contend there was no need to address the interest rate because it was understood between the parties to be the 6.1% fixed rate pursuant to the swap agreement.

Wells Fargo contends that no promise was made.  While a discussion occurred about a possible loan, Wells Fargo contends that the parties never discussed any definite terms and Wells Fargo believed Nelson was going to obtain financing elsewhere.

Nelson testified as to his understanding of a swap agreement:

Q.     Okay.  Did you understand in 2003 that a swap agreement in and of itself could be either an asset or a liability to you, setting aside whatever effect it had on interest rates?

A.     No, sir.  I was -- the benefit for myself, County 20, was that it had a fixed rate and my only obligation was to contain a loan, at least borrowed money, for a certain length of time because the amortization was larger than the term of the loan and I just had to require to keep debt in there.

It was explained to me that the debt could go anywhere in my company -- companies as long as Bob Nelson had a loan with -- at that time I always assumed it was Wells Fargo.  I didn't know it could float around or do all this stuff. I never knew it was a separate -- a separate document.

Q.      Okay.  Did you understand -- well, you knew it could attach to other debt obligations; is that fair?

A.      That I had, yes.

Q.      Correct.

And did you understand at that time that it was other preexisting debt obligations that you had?

A.      No, sir.

. . . .

A.      . . . I was told that I was guaranteed a specific rate for five years as long as I held debt.

Q.      No matter when you took this debt out over this -- incurred this debt over this five year period?

A.      Correct.

See Docket No. 30-1, p. 20.

Nelson testified that he contacted Scott Berg in early December 2008 regarding transferring the debt from Precision Equipment to County 20.  See Docket No. 30-1, pp. 37-38.  Nelson further testified that on December 24, 2008, he contacted Berg requesting the loan be transferred by year end.  See Docket No. 30-1, p. 39.  Nelson left the conversation thinking it would take two or three weeks but that Wells Fargo would "get the job done" and "[s]tart the change of application."  See Docket No. 30-1, p. 39.  Nelson called back in January "to find out how they were doing on the loan and it was -- that's when I first got introduced to it's a new loan and it's a different interest rate and we had two people talking to me at that time."  See Docket No. 30-1, p. 39.  Nelson testified that "[t]he promise was that the transfer would go seamlessly."  See Docket No. 30-1, p. 26.

8

In his deposition, Scott Berg of Wells Fargo testified that he and Nelson had a conversation on December 24, 2008 regarding the dissolution of Precision Equipment. Berg testified that "Bob [Nelson] told me that he'd have to find another means if I could not get him the money by year end and I told him I could not get the money by year end." See Docket No. 30-3, p. 18. Berg further testified that he did not recall discussing the swap agreement on December 24, 2008.

The Court finds that genuine issues of material fact exist as to whether Scott Berg made a clear, definite, and unambiguous promise to Nelson that Wells Fargo would transfer the indebtedness from Precision Equipment to County 20 pursuant to identical terms and conditions, and that the building previously subject to a Wells Fargo mortgage would be used as collateral.

### b)      SUBSTANTIAL CHANGE IN POSITION

The Plaintiffs contend that Nelson substantially changed his position because he would never have paid the Precision Equipment loan in full had he not been promised that the loan would be replaced with County 20. Wells Fargo contends that Nelson's sole reason to pay off the Precision Equipment loan was to receive a $200,000 tax advantage by winding up the business before the end of 2008.

The record reveals that Nelson's tax savings by dissolving Precision Equipment totaled approximately $200,000. Wells Fargo's amended counterclaim seeks over $270,000 in early termination fees and past due swap payments. While it seems highly unlikely that anyone would take a $200,000 gain only to be assessed a $270,000 prepayment penalty, there is evidence that Nelson was unaware at the time he paid off the Precision Equipment loan of the early termination penalty amount. The factfinder may determine that Nelson would have paid off the Precision

Equipment loan regardless of whether Scott Berg promised that the debt could be transferred to County 20.  The Court finds that genuine issues of material fact exist as to whether Nelson substantially changed his position.

**c)**     **JUSTIFIABLE RELIANCE**

The Plaintiffs contend that the third element of promissory estoppel is also met.  The Plaintiffs argue that Nelson justifiably relied on Scott Berg's representations in paying off the Precision Equipment note in full.  It would not make financial sense for Nelson to pay off the loan in full had he not been assured that Wells Fargo would enter into a replacement loan with County 20 for the same terms and conditions as the Precision Equipment loan, to run concurrently with the swap agreement.  Wells Fargo contends that it was not justifiable for Nelson, an experienced businessman, to substantially alter his position in reliance upon a brief conversation with Berg, a young banker who Nelson allegedly did not respect.

Nelson testified regarding his relationship with Scott Berg:

> Q.     Tell me about your relationship with Scott [Berg] by December of 2008.
>
> A.     Scott [Berg] was a -- new, young banker.  Wasn't the first new, young banker that I had -- it was always a joke I trained type thing.  Because we thought new bankers -- as you saw my history of the different ones that I've worked with.  Pretty much through the same grouping.
>
> This was the first time that I remember that the old banker just kind of one day left and I got a new guy.  Most of them had been interning and you get comfortable with the person.
>
> But Scott [Berg] was a -- as I understand, a very straight guy.  Young, very young.  I could tell he was fairly green in the industry, but that's what I was given and that was my bank and that's what I was going to live with.

10

Q.      Did you ever -- you had some concerns about it, is that fair, about his experience level?

A.      I always had concerns.  Not just Scott [Berg], but younger people that didn't have the many years of knowledge because that's how they get trained well is through -- through being in the business.

There's no school that can teach you banking.  I don't believe there's any school that can teach you business.  It's called the rule of hard knocks.

See Docket No. 30-1, p. 38.

Daniel Staller testified that he and Nelson, prior to Nelson entering into the swap, discussed the potential that Nelson would sell the County 20 building that was used as collateral for the loan and was connected to the swap.  See Docket No. 30-4, p. 20.  Staller also told Nelson that Wells Fargo could utilize other debts to put in place of the note on the swap.  See Docket No. 30-4, p. 20. There was no discussion before Nelson signed the 2007 swap that there had to be a preexisting debt. See Docket No. 30-4, pp. 22-23.  Staller testified that his relationship with Nelson "was such, that Bob [Nelson] knew he could come to me with his lending requests and, generally speaking, we were able to meet those requests at the bank."  See Docket No. 30-4, p. 26.  There were times that Nelson and Staller, on behalf of Wells Fargo, entered into oral commitments regarding financing:

Q.      Do you recall with Bob [Nelson] that sometimes -- for instance, do you recall at least one conversation where Bob [Nelson] requested some funds and you made an oral representation, "Go ahead.  Write the checks.  We'll get the loan documents out tomorrow"?  Do you recall at least sometimes there was oral commitments, oral representations by you that, "Yep.  We'll cover it.  We'll do it. We'll get it done"?

A.      Yes.  It would be typical that we would provide a commitment and sometimes the timing of "I've got to write the check," to the timing of me getting loan documents, there would be a delay and we'd make the commitment that, "Yes. Move forward.  We've got a commitment to you that we'll provide the funds."

Q.      Is it fair to say a lot of times in those instances a commitment was oral?  Wasn't necessarily in writing?

11

> A       I would say there were times. I would also say that many times we
> tried to provide a commitment in writing as well, but more times than not that would
> probably be an oral commitment, "Yes. We have approval. Go ahead. We have got
> somebody working on the documents." I'd say that happened with some frequency.
>
> Q.       Okay. And it would be more times than not the commitment was oral
> and then the documents would be later?
>
> A.       Yes.

See Docket No. 30-4, p. 26.

Staller, with fifteen years of experience in the banking industry, testified that he was

challenged to understand the terms and conditions of the ISDA agreement. See Docket No. 30-4,

p. 36. Staller testified that he did not understand everything presented to a customer during a

presentation on swap agreements. See Docket No. 30-4, p. 38. Because of Staller's relationship

with Nelson, Staller testified that Nelson could rely upon statements and representations Staller

made to him. See Docket No. 30-4, p. 46. Staller responded, "Yes," when asked if he would

describe Nelson "as a person that would rely upon a loan officer's advice as to what might be the

best product to fit his needs." See Docket No. 30-4, p. 46. Staller further responded, "Yes," when

asked if he agreed "that Bob Nelson would have relied upon your advice in acquiring his first swap

and trying to enter into a second swap by the time [Staller] left [Wells Fargo]." See Docket No. 30-

4, p. 47.

The Court finds that genuine issues of material fact exist as to whether Nelson justifiably

relied on Scott Berg's alleged promise. The record clearly reveals the existence of evidence that

Daniel Staller, on behalf of Wells Fargo, made oral representations to Nelson regarding financing

proposals and that Nelson was the type of person who would justifiably rely on his loan officer's

recommendations.  There is also evidence, albeit slim, that Nelson, a sophisticated businessman, should have been aware of the complex financing and the consequences of prepayment.

### d)    INJUSTICE

The Court finds that genuine issues of material fact also exist as to whether enforcing the alleged promise is the only way to avoid the alleged injustice.  There is evidence that after being advised that the 6.1% interest rate under the swap agreement could not be matched for new debt, Nelson was agreeable to pay a higher interest rate.  Nelson also allowed swap payments to be taken out of County 20's checking account without an outstanding promissory note with Wells Fargo. There are genuine issues of material fact that do not allow summary judgment at this stage in favor of the Plaintiffs as to their claim of promissory estoppel.

### 2)    EQUITABLE ESTOPPEL

The doctrine of equitable estoppel is set forth in N.D.C.C. § 31-11-06:  "When a party, by that party's own declaration, act, or omission, intentionally and deliberately has led another to believe a particular thing true and to act upon such belief, that party shall not be permitted to falsify it in any litigation arising out of such declaration, act, or omission."  In order to establish equitable estoppel, the plaintiff must show the defendant engaged in:

> (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are other than those which the defendant subsequently attempts to assert;
>
> (2) the intention, or at least the expectation, that such conduct will be acted upon by, or will influence, the plaintiff; and
>
> (3) knowledge, actual, or constructive, of the real facts.

13

Dalan, 2002 ND 46, ¶ 19, 640 N.W.2d 726 (quoting Global Acquisitions, LLC v. Broadway Park Ltd. P'ship, 2001 ND 52, ¶ 13, 623 N.W.2d 442).  "Reliance on the conduct of the party against whom equitable estoppel is asserted must be reasonable, and there must be some form of affirmative deception by that party."  Id. (quoting Global Acquisitions, 2001 ND 52, ¶ 13, 623 N.W.2d 442).

The parties agree that equitable estoppel is not a cause of action and has not been pled in this case.  Instead, the Plaintiffs assert equitable estoppel in support of their promissory estoppel claim and argue that Wells Fargo should be estopped from denying the evidence against it.  As noted above, the Court finds that genuine issues of material fact exist, particularly as to what occurred in the December 2008 meetings between Nelson and Berg.  As such, the Court is precluded from finding, as a matter of law, that the doctrine of equitable estoppel is applicable.

### 3)     STATUTE OF FRAUDS

The Plaintiffs contend that Nelson and Wells Fargo had an oral agreement that the indebtedness from Precision Equipment would be transferred to County 20 pursuant to identical terms and conditions, and that the warehouse building previously subject to a Wells Fargo mortgage would be used as collateral.  In its amended answer and counterclaim, Wells Fargo asserts the statute of frauds as a defense to this allegation.

The applicable statute of frauds in North Dakota provides as follows:

The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by the party's agent:

. . . .

4.  An agreement or promise for the lending of money or the extension of credit in an aggregate amount of twenty-five thousand dollars or greater.

> 5.  An agreement or promise to alter the terms of repayment or forgiveness of a debt that is in an aggregate amount of twenty-five thousand dollars or greater.

N.D.C.C. § 9-06-04.

The doctrine of partial performance may remove an oral agreement from the statute of frauds requirements. "The most important question is whether the part performance is consistent only with the existence of the alleged oral contract." Fladeland v. Gudbranson, 2004 ND 118, ¶ 8, 681 N.W.2d 431 (quoting Johnson Farms v. McEnroe, 1997 ND 179, ¶ 19, 568 N.W.2d 920). The North Dakota Supreme Court has been unclear as to whether part performance applies to all agreements subject to the statute of frauds or whether it is limited to contracts involving real property. Felco, Inc. v. Doug's N. Hill Bottle Shop, Inc., 579 N.W.2d 576, 580 (N.D. 1998). Asserting partial performance "might remove it from the statute of frauds." First State Bank of Goodrich v. Oster, 400 N.W.2d 593, 597 n.4 (N.D. 1993) (emphasis added) (where the debtor alleged an oral agreement existed requiring the bank to lend him sufficient funds to purchase 30 to 40 head of cattle each year for three years).

The Plaintiffs contend that Nelson and Scott Berg of Wells Fargo came to an agreement in December 2008 in which Nelson was going to pay off the Precision Equipment loan outstanding to Wells Fargo and Wells Fargo would prepare new loan documents for County 20 for the identical amount and balance outstanding as the Precision Equipment loan. The Plaintiffs argue that Nelson substantially performed on the oral agreement by paying off the Precision Equipment loan to Wells Fargo with a 90-day bridge loan acquired from another local bank, and by waiting several weeks for Wells Fargo to prepare the loan documents that would replace County 20 as the borrower and replace the collateral with a County 20 building. The Plaintiffs contend that Nelson's partial performance removes the alleged oral agreement from the statute of frauds.

Wells Fargo argues that part performance does not apply because paying off the Precision Equipment loan with a bridge loan from another bank is consistent with Nelson's plans to offset Precision Equipment's tax losses against the tax gains Nelson would receive from the County 20 building sale.

Wells Fargo cites to <u>Anheluk v. Ohlsen</u>, 390 F. Supp. 2d 865, 871-72 (D.N.D. 2005), in which this Court concluded that the alleged oral contract fell within the parameters of the statute of frauds and granted summary judgment. <u>Anheluk</u> was a legal malpractice action that stemmed from an underlying lender liability lawsuit, which related to Anheluk's attempts to obtain an FHA-residential real estate mortgage loan from Western Cooperative Credit Union. This Court found that it was "clear and undisputed that no promise to make a loan, either oral or written, was ever made by [the loan officer]." <u>Anheluk</u>, 390 F. Supp. 2d at 871-72. The Court in <u>Anheluk</u> further found:

> The partial performance cited by Anheluk is essentially his taking steps to move several personal and/or business loans from Security Bank of Hebron to Western Cooperative. The record reveals that these actions were apparently taken by Anheluk based on the optimistic and encouraging statements of [the loan officer]. However, those statements fall far short of a legal and enforceable oral promise to loan money. Simply stated, the undisputed facts fail to support a finding that there was a definite, unconditional oral promise to loan money. The undisputed evidence reveals that steps taken by Anheluk to move loans from the Security Bank of Hebron to Western Cooperative was not an express condition imposed upon Anheluk by [the loan officer] or anyone else at Western Cooperative in order to obtain an FHA loan. Anheluk's actions are not necessarily consistent with the existence of a definite and unconditional promise to make a loan. Such actions do not constitute partial performance of an alleged oral contract.

<u>Id.</u> at 872.

The present action is not comparable to <u>Anheluk</u>. Whether an oral promise existed is disputed in the present case. The Plaintiffs contend that Nelson and Scott Berg agreed that Wells Fargo would replace the existing Precision Equipment loan with another loan to County 20 that

would mirror the existing financing agreement between Wells Fargo and Precision Equipment. While the interest rate was apparently not discussed, the Plaintiffs contend the parties knew that the interest rate was a fixed 6.1% rate pursuant to the swap agreement.  If the factfinder agrees with the Plaintiffs, the alleged agreement would have been based more than on simply optimistic and encouraging statements.  The statements arguably equate with a definite, unconditional promise to loan money.  The Plaintiffs further contend that the agreement was not for the lending of money, but for the transfer of existing obligations under the swap agreement.

Even if the Court were to accept the Plaintiffs' arguments that part performance applies, "[t]he existence of an oral contract and the extent of its terms are questions of fact." RRMC Constr., Inc. v. Barth, 2010 ND 60, ¶ 7, 780 N.W.2d 656 (quoting WFND, LLC v. Fargo Marc, LLC, 2007 ND 67, ¶ 38, 730 N.W.2d 841.  The Court finds that numerous genuine issues of material fact exist that preclude granting summary judgment in favor of the Plaintiffs at this stage and preclude the Court from ruling that the terms and conditions of the oral agreement(s) are subject to the statute of frauds.

### 4)   ADMISSIBILITY OF DELL ARNESON'S TESTIMONY

The Plaintiffs also contend that Wells Fargo's habit and/or routine practices establish that the Plaintiffs are entitled to summary judgment.  Specifically, the Plaintiffs argue that Dell Arneson, another Wells Fargo customer, had a similar experience with a Wells Fargo "swap agreement" as did Nelson.  Wells Fargo contends that Dell Arneson's testimony is inadmissible.

Rule 406 of the Federal Rules of Evidence states:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is

relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

The Court has read Dell Arneson's deposition transcript.  See Docket No. 30-5.  Even if the Court were to find that Arneson's testimony was admissible to show the routine practice of Wells Fargo's usage and handling of swap agreements, summary judgment would still be denied as there are numerous genuine issues of material fact for the jury to decide.  Wells Fargo anticipates it will bring a separate motion in limine to exclude Arneson's testimony at trial.  The Court will decide whether Arneson's testimony will be admissible at a later date.


### B.   MOTION TO STRIKE JURY DEMAND

In its brief in support of its motion to strike, Wells Fargo requests that the Court strike the Plaintiffs' demand for a jury trial.  Wells Fargo contends that the Plaintiffs knowingly and voluntarily waived the right to a jury trial.  The Plaintiffs argue that Nelson did not knowingly waive his right to a jury trial when he signed the ISDA Agreement.

The Seventh Amendment guarantees the right to a trial by jury "[i]n [s]uits at common law." U.S. Const. Amend. VII.  "Whether a party has a right to trial by jury in federal court is a question of law."  Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet & Lumber Co., Inc., 195 F.3d 368, 374 (8th Cir. 1999).  A party may contractually waive its Seventh Amendment right to a jury trial. Raven Indus., Inc. v. Topcon Positioning Sys., Inc., No. Civ. 07-4154, 2009 WL 2998570, at * 7 (D.S.D. Sept. 18, 2009) (citing Nw. Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 373 F.2d 136, 142 (8th Cir. 1967)).  The waiver must be made "knowingly and voluntarily."  Westgate GV at the Woods, LLC v. Dickson, No. 10-03269-CV-S-DGK, 2010 WL 4721245, at * 2 (W.D. Mo. Nov. 15, 2010) (citations omitted).  While the Eighth Circuit has not explicitly ruled which party bears the

burden of proving whether the jury waiver was made knowingly and voluntarily, "courts within the circuit have generally held that the party attempting to enforce the waiver has the burden of proving the waiver is 'knowing' and 'voluntary.'" Id. (citing several district court decisions in the Eighth Circuit).   Several factors have been considered in determining whether the waiver was made knowingly and voluntarily:

> [Courts] have considered whether the waiver provision is on a standardized form agreement or newly-drafted document, in fine print or in large or bold print, set off in a paragraph of its own, in a take-it-or-leave-it or negotiated contract, and the length of the contract. [Courts] have also considered whether the waiving party was represented by counsel, whether the waiving party was a sophisticated business person aware of the consequences of the waiver, whether the parties were manifestly unequal in bargaining power, and whether there was an opportunity to review all of the terms of the contract and whether the waiving party did so.

Coop. Fin. Ass'n, Inc. v. Garst, 871 F. Supp. 1168, 1172 (N.D. Iowa 1995) (internal citations omitted).

In June 2008, Wells Fargo entered into a lengthy ISDA Master Agreement and a "Schedule to the ISDA Master Agreement" with Nelson and Precision Equipment.   See Docket No. 9-2. Included in the schedule is the following paragraph:

> (G)   WAIVER OF JURY TRIAL.   EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY TRIAL OR LITIGATION ARISING OUT OF OR IN CONNECTION WITH ANY TRANSACTION OR THIS AGREEMENT.

See Docket No. 9-2, p. 7 (capitals and underline in original).  Wells Fargo contends that by signing the ISDA agreement and schedule, Nelson, on behalf of himself and Precision Equipment, waived the right to a jury trial.  The Plaintiffs argue that the waiver provision should be stricken because Nelson did not knowingly and voluntarily waive his right to a trial by jury.

The ISDA agreement and schedule are standardized forms used by Wells Fargo since 1992. See Docket No. 9-1. The jury waiver provision is on page 25 of the 27-page ISDA agreement and schedule, when read together. The ISDA agreement and the schedule each include Nelson's signature. The schedule itself is nine pages long. The jury waiver provision is in capital letters and contained in a separate paragraph. There is no dispute that Nelson was not represented by an attorney and representatives of Wells Fargo did not verbally inform Nelson about the jury waiver provision before Nelson signed the ISDA agreement and schedule. See Docket No. 24-1. Nelson has a high school education, has owned and currently owns various businesses, and has been involved in numerous financial transactions over several decades. Nelson is arguably a sophisticated businessman. Nelson contends that he did not know that he was waiving his right to a jury trial when he signed the ISDA agreement and schedule. See Docket No. 24-1. The Court finds that even if Nelson was aware of the jury waiver provision, it is unlikely he was aware of the legal consequences of such a waiver.

The Court further finds that the jury waiver provision is, in essence, a "take-it-or-leave-it" adhesion provision of the contract inserted into a 27-page complex financing agreement with no discussion as to the consequences. Any court would be hard-pressed to conclude that the waiver of a jury trial was made knowingly and voluntarily under the facts and circumstances presented in this case. This was a complex derivative financing agreement that neither the Wells Fargo loan officers directly involved with the transaction understood nor did the customer (Nelson) have a clear understanding of. To suggest that there was a knowing and voluntary waiver of a jury trial is not supported by the evidence in the record. The Court denies Wells Fargo's motion to strike the jury

demand.  Justice and common sense require that a jury resolve the factual disputes that exist in this case.

**IV.**   **CONCLUSION**

For the reasons set forth above, the Court **DENIES** the Plaintiffs' motion for summary judgment (Docket No. 29) and **DENIES** the Defendant's motion to strike jury demand (Docket No. 18).  The case will proceed to a jury trial presently scheduled to commence on May 10, 2011.

**IT IS SO ORDERED.**

Dated this 3rd day of March, 2011.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

21